The CHESAPEAKE & POTOMAC TELE-PHONE COMPANY OF VIRGINIA

v.

The UNITED STATES.

No. 333–79C.

United States Court of Claims.

June 17, 1981.

Gregg H. Levy, Washington, D. C., attorney of record, for plaintiff; Paul J. Tagliabue and Covington & Burling, Washington, D. C., of counsel.

Stephen G. Anderson, Washington, D. C., with whom was Acting Asst. Atty. Gen. Thomas S. Martin, Washington, D. C., for defendant.

Before DAVIS, KASHIWA and KUNZIG, Judges.

KUNZIG, Judge.

This government contracts case comes before the court on plaintiff's motion for summary judgment on Count I of its petition and defendant's cross-motion for summary judgment. In its Count I, plaintiff contends that the Government has wrongfully withheld payment for WATS telephone services allegedly rendered to the Pentagon during the latter part of 1977. The Government, in turn, defends on the ground of accord and satisfaction and also enters a specific denial that the services were provided. We reject each of the Government's positions and, consequently, award plaintiff judgment on its Count I. The balance of the cause is remanded.

I

On September 1, 1950, the Chesapeake and Potomac Telephone Company of Virginia (C&P)[1] and the Departments of the Army, Navy, and Air Force (the Department of Defense or DoD)[2] executed a General Contract for Communication Facilities and Services (the Contract or General Contract), which contract was in effect at all times pertinent to this litigation.[3] The

---

1. C&P is a corporation organized under the laws of the Commonwealth of Virginia. It is a wholly-owned subsidiary of the American Telephone & Telegraph Company (AT&T).

2. The parties treat DoD, rather than the three signatories, as the actual contracting agency.

3. The contract was of the negotiated type. *See* Armed Services Procurement Act of 1947, Pub.

General Contract provided, *inter alia*, that C&P "shall furnish ... upon the premises of [DoD] ... located within the area directly and regularly served ... by [C&P] ... such of its regular classes of service ... as may from time to time be requested."[4] In return, DoD was required to "pay [C&P] ... an amount equal to the rates and charges for the service under the Company's established regulations." "The Company's established regulations" was defined in part to mean "the rates, terms and conditions in regularly established tariffs." The General Contract was administered for DoD by the Defense Telephone Service—Washington (DTS–W).

C&P is a regulated common carrier subject to the Communications Act of 1934, as amended. *See current version* at 47 U.S.C. §§ 151 *et seq.* (1976). As such, it is required to "furnish ... communication service upon reasonable request therefor" and to "file with the [FCC] ... schedules showing all charges for itself." §§ 201(a), 203(a). The Act mandates that "no carrier shall ... charge, demand, collect, or receive a greater or less or different compensation for such communication ... between the points named in any such schedule than the charges specified in the schedule then in effect." § 203(c). Further, "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communication service." § 202(a). *See generally American Broadcasting Companies, Inc. v. FCC*, 643 F.2d 818 (D.C.Cir.1980).

Pursuant to the General Contract and FCC tariffs,[5] C&P has provided DoD with WATS service (Wide Area Telecommunications Service) through the Pentagon switchboard. WATS service is the furnishing of dial-type telecommunications service between a station associated with a WATS access line and stations in specified service areas. In the terms of the General Contract, WATS is a type of "regular" service. For sometime prior to August 1, 1977, 147 operator-assisted, outgoing WATS access lines had been furnished to the Pentagon.

In early 1977, the parties agreed upon a changeover from operator-assisted to direct-dial WATS service. The parties also agreed that the number of WATS access lines should be increased from 147 to 202 to accommodate the increased WATS usage expected to follow. The new lines were scheduled for August 1, 1977.

To make up for the loss of operator-generated records, it was arranged that C&P would furnish, each month, a computer tape of the origin, destination, time and duration of each call placed—so-called "station detail" information. DTS–W used this information to allocate the cost of WATS service among the various agencies connected to the Pentagon switchboard and to identify calls of questionable official business. C&P does not ordinarily provide station detail information as an element of WATS service and its provision is not covered by FCC tariffs. The tapes were to begin August 1, 1977, the same date the additional WATS lines were to become available.

For the period August-November 1977, the time frame of this controversy, C&P has billed DoD for service on 200 WATS

---

L.No.413, § 2(c)(10), 62 Stat. 21 (1948) (current version at 10 U.S.C. § 2304(a)(10) (1976)).

**4.** Although the Contract contemplated that DoD would submit requests for telephone services *via* "serially numbered orders" which referred to the General Contract, DoD frequently made such requests orally or by letter. Although requests communicated in this fashion seldom, if ever, made reference to the General Contract, both parties understood that the requests were being made pursuant thereto and that the terms stated in the General Contract

would govern. Affidavit of Michael P. Orend ¶ 4 (C&P district sales manager).

While this court does not normally cite to lower court records or even affidavits, since this case peculiarly depends so importantly on appropriate affidavits, such citations have been given here to assist the reader.

**5.** Pursuant to 47 U.S.C. § 203, AT&T, in concurrence with C&P, at all times pertinent to this lawsuit, had on file with the Federal Communications Commission AT&T Tariff FCC No. 259 governing WATS service.

access lines: the original 147 lines plus 53 additional. We note that the planning had been for 202 lines, or a net increase of 55. C&P explains that while 55 new lines were "available and functioning," it was discovered that limitations in the computer software prevented more than 200 lines from being used simultaneously.[6] The billing reflects this fact.

A more serious problem arose in connection with the station detail tapes. Those made available for August through November 1977 were found to contain many errors and were considered by DTS–W to be "totally unusable."[7] This caused the agency "to question whether errors were also made in reprogramming the computer to open additional WATS access lines." *Id.* Under these circumstances, "without operator-generated records or call-detail tapes," the agency has refused to pay C&P's increased charges for the subject four months. *Id.* at ¶ 12. Instead, it has limited itself to paying an amount equal to the tariff for 147 WATS lines, the number which clearly were in service through July.

6. Affidavit of George Dishun ¶ 8 (C&P service consultant); Affidavit of Richard J. Gutmann ¶ 9 (C&P installer/repairman); Supplemental Affidavit of Richard J. Gutmann ¶¶ 6–8.

7. Affidavit of J. R. Anderson ¶ 10 (DTS Deputy Director).

8. Plaintiff timely filed this action on July 27, 1979.

9. Defendant's original papers also alleged that plaintiff had improperly failed to exhaust the administrative procedures provided by the Contract's "Disputes" clause. This defense was plainly misconceived, since this is a "breach" case, not a "dispute." *See Paragon Energy Corp. v. United States,* 645 F.2d 966 at 973 (1981). Defendant's reply brief appears to concede this point, as follows:
    The action of the contracting officer in refusing to pay C&P's entire invoices, if incorrect, was not redressable "under the contract." .... The contracting officer's refusal to pay for 200 WATS lines was ... a breach of contract that may or may not have been excusable, depending upon whether C&P actually furnished the WATS lines it had promised. There was consequently no bar to C&P filing suit directly in the Court of Claims.... [At 4.]

C&P now brings suit to recover the unpaid balance of $267,194.90.[8] The Government's response is twofold.[9] First, it pleads a binding accord and satisfaction between the parties. Second, it denies C&P's allegation that the additional WATS lines were operational during the period in question. We have examined each of these contentions and find them equally unpersuasive.

## II

### A

The facts relevant to the alleged accord and satisfaction are not genuinely in dispute, only the interpretation to be placed upon them.

Negotiations over the unpaid bills extended from December 1977 to July 1978. This culminated in a meeting on or about July 6, 1978, at which DTS advised that it "would not certify more than 147 WATS access lines for payment."[10] A few days later, DoD remitted to C&P four checks in the amount of $220,445.00 each, the monthly tariff for 147, not 200, lines.[11]

The Government has also filed a contingent counterclaim for damages caused by C&P's alleged failure to provide adequate station detail tapes for the months of August-November 1977. In turn, C&P has amended its original petition to include a second count for the Government's alleged non-payment of amounts owed for installation of the station detail equipment. We reserve these two matters for action by the trial judge. *See infra* at 718.

10. Affidavit of J. R. Anderson ¶ 12 (DTS Deputy Director). Under 31 U.S.C. § 680a (1976):
    On or after May 10, 1939, no part of any appropriation for any executive department, establishment, or agency shall be used for the payment of long-distance telephone tolls except for the transaction of public business which the interests of the Government require to be so transacted; and all such payments shall be supported by a certificate by the head of the department, establishment, or agency concerned, or such subordinates as he may specially designate, to the effect that the use of the telephone in such instances was necessary in the interest of the Government.

11. Exhibits A–D to the Affidavit of Estelle Minor (C&P business manager); Affidavit of J. R. Anderson ¶ 13 (DTS Deputy Director).

Along with the four checks, DoD submitted four vouchers, to which were attached the C&P invoices for WATS service during each of the four months in question. Each voucher applied to one month's service. The vouchers are standard printed forms and contain a space where the payment is to be marked as 1) complete, 2) partial, 3) final, 4) progress, or 5) advance. The vouchers in this case were all marked "complete."[12] Also, DoD had altered each monthly bill by striking out the stated amount due and typing in the amount that was being made in payment—$220,445.00 for each month.[13]

Neither payment procedure (marking the vouchers "complete" and changing the "total amount due" on the invoices) was unusual. It routinely happens that, in addition to the current service charge, DoD's WATS bill for a given month will reflect past due amounts owed for one or more prior months.[14] This occurs because of administrative delays in processing bills for payment. By the time the voucher and check for a given month are prepared, however, the amounts owed for prior months will already have been paid. DoD's normal practice under these circumstances is to strike through the stated amount due and to substitute the amount being tendered. Generally, the amount tendered equals the full balance claimed after taking prior payments into account. In those instances in which the parties cannot readily agree as to the existence and/or amount of alleged errors in the monthly statement, DoD often submits a partial payment covering those portions of the monthly bill not in dispute, leaving the disputed amounts for later resolution.[15]

The C&P business manager who took receipt of the checks in this case states in an affidavit—without any opposing evidence—that "on numerous occasions" in her experience "DoD and other [federal] agencies ... have tendered to C&P *partial* payment for services described in the pertinent C&P statement, even though the accompanying ... voucher contained a check mark adjacent to the line marked 'complete' under the column headed 'payment.'" The affiant continues: "In none of those instances was the partial payment received or tendered as 'complete payment' for the services described in the C&P statement for the pertinent period." In view of these "inconsistent, ambiguous and confusing" practices, "it is extremely difficult and often impossible to determine from the face of any DoD tender of checks, vouchers or statements whether the payment constitutes or is intended to constitute complete or partial payment of the *actual amount due* to C&P for services rendered to DoD." As a consequence, "we believed that the tenders of July 1978 addressing WATS service rendered from August 1977 until November 1977 were intended as partial payment of the amount due to C&P for WATS service rendered during that period."[16]

C&P thereafter handled the four checks in a routine manner, cashing them and crediting DoD's account only for the amount collected. All statements to DoD from C&P for WATS service since July 1978 have regularly included among their past due charges $267,194.90 for the unpaid balance. *Id.* at ¶ 5.

The Government now argues that C&P's cashing of the four checks tendered for the August-November period constituted a binding accord and satisfaction, precluding any further recovery in this court. This argument, however, greatly exaggerates what actually took place.

---

12. Exhibits E–H to the Affidavit of Estelle Minor (C&P business manager).

13. Exhibits 26–29 in Plaintiff's Record Materials; Affidavit of J. R. Anderson ¶ 13 (DTS Deputy Director).

14. For example, on the invoice covering August 1977, the "total amount due" was $1,254,-218.30; the current service charge was only $286,201.35. Affidavit of Estelle Minor ¶ 7 (C&P business manager); Exhibit 26 in Plaintiff's Record Materials.

15. *Compare* Affidavit of Estelle Minor ¶¶ 4–6 (C&P business manager) *with* Affidavit of J. R. Anderson ¶ 14 (DTS Deputy Director).

16. Supplemental Affidavit of Estelle Minor ¶¶ 2, 4.

### B

Accord and satisfaction denotes "one of the recognized methods of discharging and terminating an existing right" and constitutes "a perfect defense in an action for the enforcement of a previous claim, whether that claim was well founded or not." 6 Corbin on Contracts § 1276 (1962) (hereinafter "Corbin"). An "accord" is "an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due." 1 Am.Jur.2d *Accord and Satisfaction* § 1 (1962). "Satisfaction" means "the execution or performance of the agreement, or the actual giving and taking of some agreed thing." *Id.*

"The two parties may first make an accord executory. . . . When this executory contract is fully performed as agreed, there is said to be an accord and satisfaction." Corbin § 1276. An accord and satisfaction is also possible, however, "without any preliminary accord executory." *Id.*

A debtor may offer the substituted performance in satisfaction of his debt and the creditor may receive it, without any binding promise being made by either party. . . . In such cases, the new transaction is wholly executed at the very moment of acceptance. The substituted performance is fully rendered and the antecedent debt is discharged, leaving nothing more to be done by either party.

*Id.*

"The process of making an accord . . . is the same as in the case of other contracts." Corbin § 1277. "In order that a performance rendered by an obligor shall operate as a satisfaction of the claim against him, it must be offered as such to the creditor." *Id.*

There must be accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise. If not so rendered, there is no accord, either executory or executed, for the reason that there are

no operative expressions of agreement— no sufficient offer and acceptance.

*Id.* (emphasis supplied).

Significantly,

Where the amount due is in dispute, and the debtor sends cash or check for less than the amount claimed, *clearly expressing his intention that it is sent as a settlement in full* and not on account or in part payment, the retention and use of the money or the cashing of the check is almost always held to be an acceptance of the offer operating as full satisfaction, even though the creditor may assert or send word to the debtor that the sum is received only in part payment.

Corbin § 1279 (emphasis supplied). "The mere fact that the creditor receives a check . . . from his debtor for less than the amount which the creditor claims, with knowledge that the debtor claims to be indebted to him only in the amount paid, does not result in an accord and satisfaction." 1 Am.Jur.2d *Accord and Satisfaction* § 15 (1962). Instead, "[T]he debtor must also indicate that payment is offered upon condition that it be accepted in full satisfaction or not at all, or the circumstances must be such as to clearly indicate to the creditor that it was sent with that intention." *Id.*

### C

It is evident from the foregoing that merely giving a check for less than the amount claimed is not sufficient to create an accord and satisfaction. There must also be accompanying expressions clearly indicating the debtor's intention that the cashing of the check is to operate as a settlement in full. This is precisely what is lacking here.

Defendant's entire argument turns upon the adequacy of the notations which appear on the *vouchers* and *invoices* accompanying the four checks sent in July 1978: the "X" placed in the "complete payment" box of each of the four vouchers and the alteration of each of the four invoices to show a total amount due equal to the amount being remitted. Apart from the relative inconspicuousness of these notations, nowhere do they literally say that payment was offered

in full satisfaction of all claims (or some equivalent phrase), nor would it have been unreasonable for C&P not to understand that this was the intention.[17] DoD had often made partial payments in the guise of being "complete," but neither party had viewed them as being in full satisfaction. No circumstance of the July 1978 partial payment differentiated it from any prior partial payment by DoD. Given the nature of the dispute—the quantum of services—and the course of the negotiations—at an impasse because of DoD's refusal to certify any of the additional WATS lines—the most reasonable interpretation to be placed upon the "complete payment" language was that DoD was simply unwilling to pay anything more.

"It is one thing to inform a creditor when sending a check that the debtor will not pay any more, and a very different thing to advise him that the check is sent upon condition that if he accepts it, he will do so in full settlement of the account." *American Forwarding & Mercantile Co. v. Lindsay Chair Co.*, 129 Ill.App. 548 (1906). Our case, fairly read, merely presents the first instance referred to in the above quote; the second, vital element is missing.

We hold there was no accord and satisfaction in the case at bar.[18]

### III

Our next function is to determine whether there is any "genuine issue" of fact concerning C&P's performance of the alleged services, i. e., the delivery of 53 additional WATS lines during the period August-November 1977. *See* Ct.Cl.R. 101(d).

Three C&P employees, including the installer, have submitted affidavits stating that the additional lines were provided on schedule.[19] C&P's contemporaneous business records confirm these assertions.[20] By contrast, the Government's sole reliance is an affidavit by a DTS official expressing the latter's "reservations" whether additional WATS lines had been brought on stream during the August-November period.[21]

DoD has not pointed to a single factual circumstance suggesting in any way that it did not receive 200 lines during the period from August through November 1977. DoD has identified no facts indicating that the additional lines were somehow installed at some point in late November 1977 and only made available commencing in December 1977, and subsequent months. Nor has DoD submitted any facts suggesting that there was any mechanical malfunction of any kind during the period in question that would have prevented the additional lines from being operative after having been installed by C&P at the beginning of August 1977.

We note that DoD suddenly started making full payment on its WATS bills after it

---

**17.** Defendant strongly invokes *Teledyne Mid-America Corp. v. HOH Corp.*, 486 F.2d 987 (9th Cir. 1973), in support of its argument. That case is wholly distinguishable, since there the reverse of the check bore a typed notation: "In full payment of all HOH trade obligations" and a brief accompanying remittance memorandum outlined the calculations upon which the check was based. *Id.* at 991. *See generally Bobbi's Decorating and Renovation Co. v. United States*, 218 Ct.Cl. 653 (1978); *Fraass Surgical Mfg. Co. v. United States*, 205 Ct.Cl. 585, 593–594, 505 F.2d 707, 711–712 (1974); *Cannon Construction Co. v. United States*, 162 Ct.Cl. 94, 100, 319 F.2d 173, 176 (1963).

**18.** Nor have there been any exchanges between the parties subsequent to July 1978 which would cause us to alter this conclusion. *Compare Teledyne Mid-America Corp. v. HOH Corp.*, 486 F.2d 987, 993–994 (9th Cir. 1973).

C&P also argues vigorously that, even had an accord and satisfaction been entered into, it would be illegal under the Communications Act. *See supra* at 712–713. The question is difficult and has possibly broad ramifications. Because we have found no accord and satisfaction here, we do not reach it.

**19.** Affidavit of George Dishun ¶ 7 (C&P service consultant); Affidavit of Richard Gutmann ¶¶ 8–9 (C&P installer/repairman); Affidavit of Michael Orend ¶ 10 (C&P district sales manager).

**20.** Recent Change Request, stamped "COMPLETED" (attached as Exhibit B to Gutmann affidavit); Exhibits E–H to the Dishun affidavit.

**21.** Affidavit of J. R. Anderson ¶ 11 (DTS Deputy Director).

began to receive acceptable station detail tapes in December 1977. The ultimate availability of the entire complement of 200 WATS lines is thereby conceded; the only remaining task is to establish the date. Plaintiff has made a very strong showing in favor of August 1, while the Government has failed to advance any evidence in opposition. In this posture, we are unable to discern any "genuine issue." *See generally Jankowitz v. United States*, 209 Ct.Cl. 489, 507, 533 F.2d 538, 548 (1976). We find that plaintiff performed according to schedule.

In summation, we hold that the Government wrongfully withheld payment for WATS telephone services delivered to the Pentagon during the latter part of 1977. Such services were specifically provided and no accord and satisfaction exists to preclude further recovery in this court.

22. *See*, in particular, *supra* at 4 n.9.

Accordingly, after consideration of the submissions of the parties, with oral argument of counsel, plaintiff's motion for summary judgment on Count I of its petition is granted. Defendant's motion for summary judgment is denied. It is our determination that plaintiff is entitled to recover $267,-194.90 and judgment is herein entered for that amount on Count I. The remainder of the cause is remanded to the trial judge for further action not inconsistent with the above.[22]