**SPIRIT LEVELING CONTRACTORS, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 320–86C.**

United States Claims Court.

Dec. 15, 1989.

Michael W. McCarthy, Prescott, Ariz., for plaintiff.

Cheryl S. Rome, Washington, D.C., with whom was Asst. Atty. Gen. John R. Bolton, for defendant.

## ORDER

MOODY R. TIDWELL, III, Judge:

This action is before the court on cross motions for summary judgment. Plaintiff claimed additional costs associated with its performance in a contract with the Soil Conservation Service (SCS). The contract provided for sediment removal and dike restoration required for emergency watershed protection along Greene's Wash in Pinal County, Arizona. Plaintiff sought recovery based on three different types of damage allegedly sustained by plaintiff: (1) increased costs for sediment removal in the amount of $28,200.18; (2) increased costs for dike restoration in the amount of $36,320.18; (3) extension of twenty-nine calendar days in contract time and the remission of liquidated damages in the amount of $13,320.00 assessed against plaintiff for failure to finish the project in the allotted performance time. Plaintiff's first claim for relief (First Claim) was founded upon what emerges as six separate causes of action raised in its complaint:

1. Defective estimates, plans and specifications caused differing site conditions and gross quantity variations.
2. Flooding, an Act of God, caused differing site conditions.
3. Increased sediment removal and dike restoration constituted a differing site condition under the contract.
4. Plaintiff's reliance upon defendant's estimates and alleged misrepresentations, which the contracting officer acknowledged in his award to plaintiff, created an estoppel effect on defendant from refusing plaintiff's claims.
5. Defendant entered into an implied-in-fact contract with plaintiff in accepting plaintiff's bid built upon cubic yard assessments. This implied contract intimated that plaintiff was only obligated for contract performance according to the approved unit price if the actual work did not exceed the estimated amount of work upon which plaintiff based its bid.
6. Defective plans, estimates and specifications, differing site conditions, change or constructive change in conditions and course of performance and conduct of defendant resulted in delays, disruption and additional costs for total earthmoving operations.

In plaintiff's second claim for relief (Second Claim), plaintiff sought recovery under a total cost theory of recovery for a breach of contract, arising from huge expenditures due to defective specifications, differing site conditions, misrepresentations and delay and disruption damages. Plaintiff impugned such discrepancies to defendant, maintaining that due to the voluminous damages plaintiff incurred, it had become virtually impossible for plaintiff to calculate reparations owed to it by defendant.

Plaintiff's third claim for relief (Third Claim) attributed plaintiff's failure to complete the contract within the extended contract period to government misrepresentation of the quantity of work to be performed by plaintiff, as well as: 1) defective estimates; 2) defective plans and specifications; 3) differing site conditions; and 4) change or constructive change in contract performance due to defendant. Plaintiff sought an extension of the contract time and compensation in the form of liquidated damages.

Defendant opposed government liability with a cross-motion directed at all plaintiff's allegations.

## FACTS

As a result of severe flooding in Pinal County, Arizona, in October 1983, the

Greene's Reservoir Control District (GRCD) applied to the SCS for assistance in repairing flood damage. Pursuant to Section 216 of the Emergency Flood Control Act of 1950, Public Law 81–516, and Section 403 of the Agriculture Credit Act of 1978, Public Law 95–334, the SCS reviewed the type and extent of damages and approved the GRCD request for assistance.

In December 1983, SCS personnel began to gather data to design and prepare a contract for the restoration of the damaged area. The crew took survey shots with a level and surveying rod on the approximate center line of Greene's Wash at roughly 300 foot intervals. From these survey shots, the engineers established the design grade for the restoration project. The SCS conducted a further layout survey on February 7, 1984. This survey was taken at approximately 100 foot intervals along Green's Wash for the purpose of setting the cut stakes at the lateral limits of the area to be excavated.

Mr. Arthur N. Luhtala, an SCS design engineer on the project, prepared the project's plans as well as cubic yard estimates of the quantities of dike restoration and sediment removal. Mr. Luhtala estimated 146,460 cubic yards of sediment removal and 95,090 cubic yards of dike restoration based upon the December 1983 surveys. However, as was discussed at the site showing, the quantity of dike restoration was not to be calculated in cubic yards due to the exigent nature of the job. Furthermore, the Bid Schedule in the contract provided for payment for sediment removal and dike restoration on a linear foot basis. Construction Specifications 216–5 & 216–6.

Additionally, during the pre-bid conference it was indicated that certain dike restoration sites would not have to be totally removed and replaced but simply repaired. The plans did not specify, however, which sites would have to be entirely reconstructed. Therefore, Mr. Luhtala, in formulating his estimates on dike restoration, considered as a factor that certain dike restoration sites would only have to be repaired as opposed to totally removed and replaced. The decision of which sites would receive which treatment was to be a field determination defined during contract performance. However, plaintiff was not notified during prebid nor preconstruction meetings that such determinations would be revealed at a later date.

During contract performance, four modifications to the contract were issued. Modification # 1 was issued May 15, 1984 and permitted plaintiff to utilize additional borrow and disposal areas at no extra cost to defendant. Plaintiff signed and accepted this modification on May 24, 1984. On September 10, 1984, plaintiff also signed and accepted a second modification which added a new bid item entitled "obstruction removal" for a lump sum price of $637.12. Modification # 3, issued on October 12, 1984, extended the completion date fourteen days due to weather-related delays. On November 6, 1984, modification # 4 further extended the completion date twenty-four calendar days due to similar weather-related problems.

On December 14, 1984 and on January 17, 1985, plaintiff submitted three certified claims to the contracting officer. Two of these claims were granted on May 22, 1985. Plaintiff appealed the denial of its third certified claim to this Court. The contracting officer's final decision on this claim had not allowed liquidated damages for certain alleged extra dike restoration and sediment removal. Plaintiff's claim had articulated that discrepancies in conditions and variations had been the result of heavy rains and flooding.

In contrast to plaintiff's certified claim, the crux of plaintiff's pending motion for summary judgment focused upon the defendant's plans, specifications and estimates, as opposed to weather conditions. Plaintiff asserted before this court blatant and wrongful misrepresentation by the SCS, as well as deliberate withholding of vital superior knowledge, negligence and breach of warranty on defendant's part. Defendant argued that this court lacks proper jurisdiction to decide these claims, *inter alia*, and therefore plaintiff's motion should be denied and defendant's motion granted.

## DISCUSSION

### I. Summary Judgment

■ A case is ripe for summary judgment when there exist no disputed genuine issues of material fact and the moving party is entitled to judgment as a matter of law. RUSCC 56(c). A genuine issue of material fact[1] is present if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The burden of proof rests upon the party opposing the motion to prove by sufficient evidence that a genuine issue of material fact positively remains. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324–25, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970). Any evidence presented by the non-movant is to be believed and all justifiable inferences drawn in its favor. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514; *Adickes*, 398 U.S. at 158–59, 90 S.Ct. at 1609. The procedure of summary judgment is properly regarded not as a disfavored shortcut, but rather as an integral part of the court rules as a whole, which rules are designed to secure a just, speedy, and inexpensive determination of each and every action. *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555 (citations omitted).

■ When there are motions for summary judgment by both parties, the court must scrutinize each participant's motion on its own merits. "Accordingly, this court must draw all reasonable inferences against the party whose motion is under consideration." *Robinson Contracting v. United States*, 16 Cl.Ct. 676, 680 (1989); *see Mingus Constructors v. United States*, 812 F.2d 1387, 1391 (Fed.Cir.1987). Although both parties have moved for summary judgment, this does not require the court to grant judgment as a matter of law for one party or the other. *Mingus*, 812 F.2d at 1391.

### II. Subject Matter Jurisdiction and Certification of Claims

■ First and foremost, this court finds it necessary to examine whether plaintiff's claims alleging governmental liability were improperly certified, as defendant contended, so as to prohibit plaintiff from bringing them to this court. Want of subject matter jurisdiction is a defect that cannot be waived. *Hambsch v. United States*, 857 F.2d 763, 765 (Fed.Cir.1988). "[E]ven if parties remain silent, it is well settled that a federal court, whether trial or appellate, is obliged to notice on its own motion the want of its own jurisdiction." *Id.* (citations omitted). If this procedural question is answered in the negative, no other issues need be examined. "When a court lacks the appropriate jurisdiction necessary to proceed with a case, it is correspondingly without authority to decide the merits of that case." *Id.; see, e.g., Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 812–13, 108 S.Ct. 2166, 2175–76, 100 L.Ed.2d 811 (1988); *Cf. Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 549, 106 S.Ct. 1326, 1335, 89 L.Ed.2d 501 (1988).

■ For this court to exercise jurisdiction over this matter, plaintiff's claims must have been "claims" within the definition of the Contract Disputes Act (CDA). This act defines a "claim" as: "(1) a written request submitted to the Contracting Officer; (2) for payment of money, adjustment of contract terms, or other relief; (3) which is in dispute...." 44 Fed.Reg. 12,524(b) (1979). Accordingly, contractor claims against the government must be presented in writing to the contracting officer for the court to maintain proper jurisdiction to dispose of the matter.[2] 41 U.S.C. § 605(a) (1982); *see Santa Fe Eng'rs v. United States*, 818 F.2d 856, 858 (Fed.Cir. 1987). "The purposes of the certification requirement are to discourage the submis-

---

1. A fact is material if it could affect the outcome of the suit, and its materiality is determined by the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

2. Only claims against the government in excess of $50,000 are required to be certified. 41 U.S.C. § 605(c) (1982).

sion of unwarranted contractor claims and to encourage settlements" as well as confirm that the claim is accurate and complete. *Folk Constr. v. United States,* 226 Ct.Cl. 602, 604 (1981). Absent a certified written claim, the court lacks jurisdiction to consider a cause of action.[3] *Santa Fe Eng'rs,* 818 F.2d at 858; *LDG Timber Enters. v. United States,* 8 Cl.Ct. 445, 452 (1985). For a claim to be properly certified, it should also include the following attestations by the contractor, as delineated in 41 U.S.C. § 605(c):

1. that the claim is made in good faith;
2. that the supporting data are accurate and complete to the best of the contractor's knowledge and belief; and
3. that the amount requested accurately reflects the contract adjustment for which the contractor believes the Government is liable.

*See also Aeronautics Div., AAR Brooks & Perkins Corp. v. United States,* 12 Cl.Ct. 132, 135 (1987). Therefore, this court is faced with "two questions for decision on the Government's motion ... first, did the plaintiff submit a sufficient claim to the contracting officer for final decision; and second, even if a sufficient claim was submitted, was it certified?" *Technassociates, Inc. v. United States,* 14 Cl.Ct. 200, 209 (1988).

■ In the present action, plaintiff filed its complaint in this court pursuant to the direct access provision of the CDA. 41 U.S.C. § 609(a)(1). This provision permits the contractor to bring an action directly on a claim in the Claims Court in lieu of appealing the contracting officer's final decision on that claim to an agency board. *See Paragon Energy Corp. v. United States,* 645 F.2d 966, 971–72, 227 Ct.Cl. 176 (1981). Plaintiff submitted its certified claims to the contracting officer in December and January. The officer rendered his decision the following May. On their face, plaintiff's claims appear to be procedurally sound. However, in these valid certifications of plaintiff's claims, plaintiff never

attributed the differing site conditions and quantity variations to defendant. Instead, plaintiff's claims imputed the weather conditions as a likely source of its complications; nowhere did plaintiff specifically mention defendant as a likely source of the problems. Plaintiff's claim exacted additional compensation for extra work due to "flooding differing site conditions, flooding and revision...." *See* Contracting Officer's Summary of Plaintiff's Claims.

The law is well settled that "in a direct access action in the Claims Court, a contractor may increase the amount of his claim, but may not raise any new claims not presented and certified to the contracting officer." *Santa Fe Eng'rs,* 818 F.2d at 858 (emphasis in original) (citations omitted). Plaintiff maintained that it is not raising any new claims but that, in essence, this is an old claim previously certified. Plaintiff based this argument on the contracting officer's summaries of plaintiff's claims regarding dike restoration and sediment removal. These summaries are outlined below:

Claim Item # 1

Bid Item # 3, Dike Restoration, was bid at $16.72 per linear foot for an estimated quantity of 14,335 linear foot of dike to be restored/ repaired as shown on the drawings and staked in the field.

The contractor claims that an additional 43,891.6 cubic yards of material and 426 linear foot of dike had to be constructed which had not been anticipated at the time of the bid, due to either *inaccurate quantities estimates* and/or as a result of "the heaviest rainfall and worst flooding in memory during the project term."

Claim Item # 2

Bid Item # 2, Sediment Removal, was bid at $15.21 per linear foot for an estimated quantity of 16,425 linear foot of sediment removal to be removed as shown on the drawings and staked in the field. Between stations 240 + 00 and

---

**3.** If the contracting officer fails to issue a final written decision on a contract claim within sixty days of receipt of a properly submitted claim, his silence is considered a denial of the claim.

41 U.S.C. § 605(c)(5). This type of a denial, like actual certification, gives this court jurisdiction to decide the claim.

270 + 00. *The contractor encountered additional material which were not shown on the drawings.*

The contractor computes this additional material to be 14,724.9 cubic yards. The government survey data indicates that an additional, unanticipated amount of sediment between station 233 + 00 and 272 + 25 in the amount of 16,176 cubic yards existed.

Claim Item # 3

Contractor completed all work 24 days after the completion date (time) specified in the contract. Contractor request restoration of $13,320 withheld as liquidated damages and claims the delays were a result of a differing site condition.

Defendant's Appendix Vol. I at 21–22 (emphasis added as in Plaintiff's Response to Cross Motion for Summary Judgment at 3).

▮ From the plain language of these summaries it is evident that plaintiff's assertion that the highlighted phrases connote the contracting officer's acknowledgement of government misrepresentations is strained. It is not entirely clear that the estimates referred to are government estimates. Similarly, plaintiff is merely presuming that the contracting officer surmised that defendant may have been guilty of misrepresentation and/or governmental withholding of superior knowledge. Accordingly, defendant's culpability had never been a defined allegation in the certified issues and this court cannot consider these claims at present nor in the future. "[I]f a claim is comprised of various aspects, which aspects arise out of a common set of operative facts, the claim must be presented, for certification purposes, in its entirety and not in its individual aspects." *LDG Timber Enters.*, 8 Cl.Ct. at 452; *see J.F. Shea Co. v. United States*, 4 Cl.Ct. 46, 54 (1983); *Warchol Constr. v. United States*, 2 Cl.Ct 384, 389 (1983). The determination of whether claims are merely various facets of a solitary claim involving a common set of operative facts or actually several individual claims being raised together

does not hinge upon the contractor's depiction but rather upon whether the demand for relief arose out of essentially interconnected conduct, services, and same or closely-connected facts. *Walsky Constr. v. United States*, 3 Cl.Ct. 615, 618–19 (1983). Although both weather-dependent claims and misrepresentation or withholding claims could be classified as "differing site condition" claims, the two are inordinately dissimilar. To present the two claims as one in the same would be detrimental as liability is dependent upon this distinction. Furthermore, government misrepresentation and/or withholding of vital information are extremely critical issues; such issues should neither be insinuated nor manipulated from the phraseology utilized by a contracting officer. Therefore, this court will not consider plaintiff's claims based on the uncertified issues.

Additionally, plaintiff asserted that these issues were certified because the contracting officer referred to unanticipated supplementary cubic yards of material and linear feet of dike that had to be constructed due to either inaccurate quantity estimates and/or rainfall and flooding. However, the evidence presented to the court does not demonstrate that the estimates to which the contracting officer cites are even defendant's estimates nor does the evidence indicate when these claims were raised. Most likely, these claims were raised during the settlement negotiations with the contracting officer in an oral discussion.[4] Regardless, such claims cannot be heard in this court unless they were raised in either plaintiff's written claim to the contracting officer or its attachments thereto. 41 U.S.C. § 605(a). This was not done in the case at bar.

▮ Another point which the court believes needs to be addressed is plaintiff's citation to *Palumbo v. United States*, 113 F.Supp. 450, 125 Ct.Cl. 678 (1953), as precedent for the proposition that this court must exercise jurisdiction over the matter because the contracting officer alluded to

---

4. The contracting officer believes that this may have been the case. *See* Defendants Cross–Motion for Summary Judgment and Opposition to

Plaintiff's Motion for Summary Judgment at 8 n. 3.

an inaccurate estimate claim in his decision. Plaintiff misconstrued *Palumbo. Palumbo* discussed the ability of the court to review a case similar to the one at hand but only after assuming that the claim requirements had been waived by the contracting officer and the head of the department involved. *Id.* 113 F.Supp. at 456–57. Clearly, the contracting officer in the present action had not waived the certification guidelines for plaintiff[5] nor did he have authority to waive a requirement that Congress imposed. *Paul E. Lehman, Inc. v. United States,* 673 F.2d 352, 356, 230 Ct.Cl. 11 (1982). Furthermore, a contracting officer does not possess authority to bestow the necessary jurisdiction upon the court. Accordingly, this court finds that plaintiff's claims alleging defective plans, specifications, and estimates, as well as government misrepresentation should be dismissed as they lack proper certification.

### A. Release of Claims

▀▀▀▀ This court's decision is mindful of the fact that on December 18, 1984 plaintiff's owner, Mr. Koepnick, executed a "Release of Claims" in addition to receiving final payment under the contract terms. This release, relinquished government liability "from any and all claims of any character whatsoever" arising under and by virtue of the contract, except those stipulated in the certified claim letter. The contracting officer had forewarned plaintiff at the preconstruction conference that any claims to be reserved, must be distinguished as exceptions to the final release. Final payment to the contractor by the government bars consideration of any claims for damages under the contract which are submitted subsequent to the final payment. *Mingus Constructors,* 812 F.2d at 1391–92. In essence, failure to classify any such claims results in their waiver. "Exceptions to releases are strictly construed against the contractor." *Id.* at 1394.

### B. Accord and Satisfaction

▀▀▀▀ Assuming, for purposes of analysis only, that plaintiff's claims which place the onus on defendant had been certified, such claims would nonetheless be barred by accord and satisfaction. As the term "accord and satisfaction" indicates, both an accord and a satisfaction are necessary to bar a claim. *E.g., Grad Partnership v. United States,* 4 Cl.Ct. 359, 360 (1984). An accord is an agreement by one party to supply or perform and by the other party to accept, in settlement or satisfaction of an existing claim, something other than what was actually due. *Chesapeake & Potomac Tel. Co. v. United States,* 654 F.2d 711, 716, 228 Ct.Cl. 101 (1981). Satisfaction is the execution and/or performance of the agreement, the actual giving or taking of some agreed upon item or service. *Id.* 654 F.2d at 711. In the case at bar, plaintiff sought to retract a negotiated settlement complete with consideration, competent parties, and a meeting of the minds—in short, an accord and satisfaction. *See Brock & Blevins Co. v. United States,* 343 F.2d 951, 955 (Ct.Cl.1965). Plaintiff's agreement to the settlement constituted the accord; the satisfaction occurred when plaintiff accepted final payment. If the facts were as plaintiff alleged, plaintiff should have never agreed to the settlement negotiated with the contracting officer prior to the contracting officer's final decision. Though plaintiff claimed that the contracting officer's decision did not indicate full settlement, plaintiff nonetheless accepted the contracting officer's proposals without stipulating that the matter needed to be discussed further. Moreover, the December 13, 1984 "Release of Claims" that plaintiff signed was a qualified release "to be completed on form for final payment only." Because plaintiff had notice that these modifications were final upon final payment and that no other claims could be raised nor money exchanged, this court finds that there existed an accord and satisfaction, with final payment constituting consideration, which now

---

**5.** Plaintiff also advanced several other similar rejoinders suggesting a privileged waiver on this court's jurisdictional requisites. However, none were on point nor binding on this court as they were all board decisions.

binds plaintiff. "[A] contractor who accepts without reservation or protest the benefits of a supplemental agreement increasing his compensation may not later claim further compensation for alleged breach of contract." *Fraass Surgical Mfg. Co. v. United States*, 505 F.2d 707, 712, 205 Ct.Cl. 585 (1974) (emphasis in original); *see Brock & Blevins Co.*, 343 F.2d at 954–55; *Seeds & Derham v. United States*, 92 Ct.Cl. 97, *cert. denied*, 312 U.S. 697, 61 S.Ct. 731, 85 L.Ed. 1131 (1940) (holding that a contract modification for equitable adjustment in recompense for extra labor costs under a changes clause was intended to cover the entire increase in costs, whether from delay or otherwise).

Consequently, as a result of the court's lack of jurisdiction to hear uncertified claims, or otherwise as a result of a bar due to release and/or accord and satisfaction, counts one, four, and five of the First Claim for Relief are dismissed in their entirety. Similarly, portions of counts two and three in the First Claim for Relief, as well as portions of the Second and Third Claims for Relief, unrelated to the Suspension of Work Clause, doctrine of estoppel claims or weather-precipitated Differing Site Conditions, are dismissed.

### III. Differing Site Conditions and Weather–Related Claims

As plaintiff had not properly certified its claims alleging misrepresentation, wrongdoing, or delay by defendant, there is no need to consider the issue of differing site conditions with respect to these accusations. However, there are enduring questions as to whether or not such differing site conditions exist due to "Acts of God." It is imperative that these queries be examined to ascertain whether plaintiff should be awarded extra monies for its performance.

■ The government ordinarily relies on the Differing Site Conditions Clause to defeat unascertainable risks not atypical of a competitive bidding arrangement, and to procure favorable offers from bidders who need not worry about such caveats. *Stock & Grove, Inc. v. United States*, 493 F.2d

629, 204 Ct.Cl. 103, 136 (1974). Such a contractual policy permits the government to decrease costs while simultaneously compensating bidders who manage subsurface conditions not envisioned when preparing bids and not readily apparent from site observation or obtainable data. *Id.* Plaintiff did not indicate whether it desired recovery under a Type I differing site condition or a Type II differing site condition. Therefore, the court finds it necessary to examine both categories with respect to plaintiff's claims.

Preliminarily, however, the differing sites conditions provisions of the contract must be set forth. It states:

(a) The Contractor shall promptly, and before such conditions are disturbed, notify the Contracting Officer in writing of:

(1) Subsurface or latent physical conditions at the site differing materially from those indicated in the contract, or (2) unknown physical conditions at the site, of an unusual nature, differing materially from those ordinarily encountered and generally recognized as inhering in work of the character provided for in this contract. The Contracting Officer shall promptly investigate the conditions, and if he finds that such conditions do materially so differ and cause an increase or decrease in the Contractor's cost of, or the time required for, performance of any part of the work under this contract, whether or not changed as a result of such conditions, an equitable adjustment shall be made and the contract modified in writing accordingly.

(b) No claim of the Contractor under this clause shall be allowed unless the Contractor has given the notice required in (a) above; provided, however, the time prescribed therefore may be extended by the Government.

(c) No claim by the Contractor for an equitable adjustment hereunder shall be allowed if asserted after final payment under this contract.

Further, because defendant contended that it did not receive proper notice of a differing site condition from plaintiff, Spe-

cial Provision twenty-three of the contract must also be scrutinized. In relevant part, provision twenty-three states:

ADMINISTRATION OF THE DIFFERING SITES CLAUSE

(a) *Nature of clause.* Clause 4 of the General Provisions ... provides for an equitable adjustment to the Contractor or the Government which reflects the increases or decreases in the Contractor's cost of and time for performance that result from a differing site condition (as that term is defined in the clause) encountered by the Contractor. However, an equitable adjustment is only available to the Contractor if he gives the Contracting Officer a prompt notice in writing before disturbing the conditions (or secures an extension of the time for giving such notice) and asserts the claim before final payment under the contract.

(b) *Notice of differing site conditions.* When the Contractor believes that a differing site condition has been encountered, the clause requires that a prompt written notice be given to the Contracting Officer so that the condition of the site can be investigated, the facts can be ascertained, and a determination can be made regarding the presence or absence of a differing site condition.

It is undisputed that plaintiff did not provide the Contracting Officer with prompt, written notice regarding the contested differing site condition. However, plaintiff asserts that its claims merit exception because (1) defendant was raising an affirmative defense that was barred due to defendant's failure to respond with the defense in its answer, and (2) the government had been on notice of the differing conditions due to information it possessed. While plaintiff's arguments may have merit, the court will not examine them; hypothesizing that notice was satisfactory, plaintiff's cause of action fails nonetheless.

6. The scope of the word "indicated" in a contract document depends on interpretation of the contract, therefore classifying its definition is a

### A. Type I Differing Site Condition

To prevail upon a Type I differing site condition, "plaintiff must prove, by a preponderance of the evidence, that the conditions described or indicated [6] in the contract were materially different from those encountered during performance." *Stuyvesant Dredging v. United States,* 11 Cl.Ct. 853, 858 (1987) (citations omitted). To determine whether plaintiff has made such a compensable showing the court must place itself "into the shoes of a 'reasonable and prudent' contractor," *P.J. Maffei Bldg. Wrecking Corp. v. United States,* 732 F.2d 913, 917 (Fed.Cir.1984) (quoting *H.N. Bailey & Assocs. v. United States,* 449 F.2d 387, 390, 196 Ct.Cl. 156 (1971)), and ascertain whether the conditions actually encountered were reasonably unforeseeable on the basis of all the information available to the contractor at the time of bidding. *Pacific Alaska Contractors v. United States,* 436 F.2d 461, 469, 193 Ct.Cl. 850 (1971). Plaintiff must also demonstrate that it reasonably relied upon its interpretation of the contract and contract-related documents and that it was damaged as a result of material variation. *Sanders Constr. and Ray Kizer Constr. v. United States,* 618 F.2d 121, 220 Ct.Cl. 639, 640–41 (1979). Finally, the contractor must demonstrate that the excess costs are attributed entirely to the materially different subsurface conditions met at the site. *Weeks Dredging & Contracting v. United States,* 13 Cl.Ct. 193, 218 (1987), *aff'd,* 861 F.2d 728 (Fed.Cir.1988) (citations omitted).

Claims alleging differences in anticipated quantity of materials rather than differences in character and nature, do not constitute a typical differing site condition claim. *Weeks Dredging,* 13 Cl.Ct. at 220. In this action, plaintiff is asserting a differing site condition claim based on excess quantity. Therefore, plaintiff's claim with respect to a category one differing site conditions clause fails from the outset. In addition, plaintiff's claim fails under a Type I differing site condition be-

matter of law to be determined at the court's discretion. *J.F. Shea Co. v. United States,* 4 Cl.Ct. 46, 51 n. 5 (1983).

cause plaintiff had notice that there was an emergency situation due to flooding and heavy rains. Plaintiff knew the conditions of the site and that they were prone to flooding, regardless of what was or was not indicated in the contract. "It is the rule that a contractor who knows or should have known the facts of the conditions at the site is estopped to claim a changed condition. Where he knows or has opportunity to learn the facts, he is unable to prove ... that he was misled by the contract." *Vann v. United States*, 420 F.2d 968, 982, 190 Ct.Cl. 546 (1970); *see Stuyvesant Dredging*, 11 Cl.Ct. at 859. When there are no representations, there exists no Type I differing site conditions. *Pacific Alaska Contractors*, 436 F.2d at 469. Accordingly, plaintiff clearly cannot be granted recovery on the basis of a Type I differing site condition.

### B. Type II Differing Site Condition

When a contractor seeks to recover under a Type II differing site claim, it must establish that the conditions encountered were unexpected and materially peculiar in nature from the conditions anticipated and perceived as intrinsic in common contract interpretations. *Charles T. Parker Constr. v. United States*, 433 F.2d 771, 778, 193 Ct.Cl. 320 (1970); *Baltimore Contractors v. United States*, 12 Cl.Ct. 328, 335 (1987). Plaintiff's arguments as to differing site conditions due to alleged "acts of God" are of the clause II type and thus must be examined as such.

Plaintiff's complaint alleged that after construction commenced, excessive rains and floodings on the project site necessitated plaintiff's participation in unanticipated sediment removal, dike restoration and increased excavation outside the scope of the original contract documents. This allegation fails under a Type II differing site condition because "[w]here climatic conditions produce unexpected, unanticipated

and unprecedented weather conditions which affect contract performance, such weather conditions, deemed to be acts of God, generally are not within the purview of the Differing Site Conditions (changed conditions) Article." *Turnkey Enters. v. United States*, 597 F.2d 750, 759, 220 Ct.Cl. 179 (1979). In order to be successful on a Type II differing site condition claim, a plaintiff must demonstrate that he encountered something materially different from the "known" and "usual." *Charles T. Parker Constr.*, 433 F.2d at 778 (1970).

 In this action, it is evident that plaintiff knew about the weather-related circumstances. The contracting officer's testimony in his final decision explained: 1) that during the course of the project there were two small flows due to normal rainfall; and 2) that the "heaviest rainfall and worst flooding in memory" referred to by the contractor in his claim was on or about the 3rd of October 1983, approximately five months before the award of this contract and the result of which was the reason for this work. Plaintiff was employed for the sole purpose of alleviating a critical flooding and rain damage problem at Greene's Walsh Emergency Watershed Project. Plaintiff was not only forewarned about the emergency nature of the job, but plaintiff had previously been employed to work on similar crisis situations. Therefore, the weather associated difficulties plaintiff encountered should have been far from surprising.[7]

 Where weather conditions have been such that the contractor was on notice of what type of conditions to expect during contract performance, the situation will not be considered a differing site condition. *Tombigbee Constructors v. United States*, 420 F.2d 1037, 1043, 190 Ct.Cl. 615 (1970). As plaintiff has failed to exhibit by a preponderance of the evidence that the site conditions were any different than those to

---

**7.** Robin P. McArthur, a hydraulic engineer for the United States, conducted a study upon completion of the project with respect to plaintiff's contentions of unanticipated excessive rains. Mr. McArthur's report corroborated defendant's position and discredited plaintiff's averments as

to abnormal precipitation. Rainfall and runoff in the area in December 1986 was not unusual nor were any of the events encountered; such incidents occurred on the average of one out of every two years.

be expected, plaintiff's Type II differing site condition claim must be denied. Furthermore, plaintiff's claim fails as a Type II differing site condition because the contract does not specifically allocate liability. Where a contract does not specifically allocate liability, neither party to that contract is responsible to the other for damages caused by an act of God. *Arundel Corp. v. United States*, 103 Ct.Cl. 688, 711–12, *cert. denied*, 326 U.S. 752, 66 S.Ct. 90, 90 L.Ed. 451 (1945).

### IV. The Suspension of Work Clause

■ Plaintiff also maintained that it would be entitled to a recovery by formula of the Suspension of Work Clause. The court, however, disagrees with plaintiff on the applicability of this recovery theory. Plaintiff has not established the requisite elements for recovery under the Suspension of Work Clause. Plaintiff has not proven that the contract performance delay was for an unreasonable period of time nor that defendant exclusively and directly caused the detainment. *John A. Johnson & Sons v. United States*, 180 Ct.Cl. 969, 986 (1967); *Beauchamp Constr. v. United States*, 14 Cl.Ct. 430, 437 (1988). "Relative to proving that the delay was directly caused by the government, the contractor must concomitantly show that it was not delayed by any concurrent cause that would have independently generated the delay during the same time period even if it does not predominate over the government's action as the cause of the delay." *Beauchamp Constr.*, 14 Cl.Ct. at 437 (citing *John McShain, Inc. v. U.S.*, 412 F.2d 1281, 188 Ct.Cl. 830 (1969)) (emphasis in original); *see Merritt–Chapman & Scott Corp. v. United States*, 528 F.2d 1392, 208 Ct.Cl. 639 (1976). As plaintiff has advanced both the government and the weather as the offenders to its predicaments, it is not faulting defendant alone; thus its suspension of work claim does not withstand scrutiny.

### V. The Doctrine of Estoppel and Contracts Implied–in–Fact

■ Plaintiff also alleges that the doctrine of estoppel should allow plaintiff relief. The court, however, disagrees. Equitable Estoppel may prohibit a party from raising a defense or objection otherwise permitted, or from bringing an action to court which it could pursue in usual circumstances. *See Jablon v. United States*, 657 F.2d 1064, 1068 (9th Cir.1981); *Biagioli v. United States*, 2 Cl.Ct. 304, 307 (1983). Equitable estoppel is applicable, however, only if four requirements are met:

(1) the party to be estopped must know the facts;

(2) the party to be estopped must have believed that his conduct would be acted on or must so act that the party asserting the estoppel has a right to believe it is so intended;

(3) the latter must be ignorant of the true facts; and

(4) it must rely on the former's conduct to his injury.

*Pacific Gas & Elec. v. United States*, 3 Cl.Ct. 329, 340 (1983), *aff'd*, 738 F.2d 452 (Fed.Cir.1984).

■ In this action, plaintiff contended that defendant had made false representations to the bidders. Conversely, however, the evidence showed that defendant avoided making representations at all. When bidders asked for volume figures at the site showing, the contracting officer warned that the figures were merely estimates. Koepnick Dep. at 7–8. Mr. Lambson, the contracting officer, declined to distribute these figures at the site showing and recommended that the bidders make their own assessments. Declaration of David O. Lambson. It was only when Mr. Koepnick, plaintiff's owner, telephoned Mr. Luhtala, SCS design engineer, that Mr. Koepnick received any estimates.

■ Nonetheless, assuming *arguendo*, that such estimates could be considered government representations, plaintiff's claim still would not survive scrutiny in light of the Conditions Affecting The Work Clause. This clause states:

The Contractor shall be responsible for having taken steps reasonably necessary to ascertain the nature and location of the work, and the general and local con-

ditions which can affect the work or the cost thereof. Any failure by the Contractor to do so will not relieve him from responsibility for successfully performing the work without additional expense to the Government. The Government assumes no responsibility for any understandings or representations concerning conditions made by any of its officers or agents prior to the execution of this contract, unless such understanding or representations by the Government are expressly stated in the contract.

Apart from the implications that plaintiff had not carefully examined the project area or that Mr. Luhtala's estimates could not conceivably be deemed as part of the contract or as an "implied-in-fact" contract, this clause expressly provided that the government did not assume responsibility for any representations concerning the conditions made by government employees unless those representations were "expressly stated in the contract." The conditions asserted by plaintiff were not explicitly incorporated into the contract; therefore, plaintiff's claim must fail. Moreover, even if these conditions had been in the contract, Mr. Luhtala's bid schedule estimates for the sediment removal were precisely accurate in terms of linear feet and his appraisals for the dike restorations only varied from the actual linear foot estimate by a mere one percent. Therefore, any plausible damages would be attributable to plaintiff's own delinquency in calculating its bid.

Most significantly, however, Mr. Koepnick himself admitted that the contract work was to be done on the basis of linear feet and the contract nowhere provided for work or payment to be made on the basis of cubic feet. Koepnick Dep. at 10–11. He

also assented to the point that he had been aware of these terms when he signed the contract. *Id.* With this acknowledgement, it is evident that in this circumstance the contract speaks for itself and that plaintiff's assertions regarding cubic yards and discrepancies with the linear foot measurements are without merit.[8]

It is evident that defendant did not misrepresent estimates nor did defendant expect plaintiff to rely on the estimates provided. A reasonable and prudent contractor would not have relied on these estimates given the warnings and admonitions that defendant and defendant's contracting officer had made. Therefore plaintiff's reliance on these estimates was unreasonable.

Finally, plaintiff alleged that somehow the contracting officer's use of cubic yard figures in rendering a final decision on plaintiff's claim denotes that plaintiff could rely on cubic yard estimates. The court finds this argument to be completely without merit. In fact, the converse of plaintiff's argument was affirmed when the contracting officer, in his final decision, stated that the contract was based on linear feet by referring to "linear estimates." The contracting officer's mention of cubic yard measurements were solely for the purposes of measurement and payment upon settlement. Declaration of David O. Lambson ("in my final decision I used cubic yards as a basis of determining equitable adjustment").

Accordingly, because there is no valid differing site conditions claim, suspension of work claim, nor a contract based on reliance, the court must dismiss plaintiff's remaining claims: counts two, three and six of the First Claim, and the residual counts in the Second and Third Claims.

8. Plaintiff further admitted that both the bid schedule and contract stated that sediment removal and dike restoration would be paid for on the basis of a unit price per linear foot. Koepnick Dep. at 11–12. Nonetheless, plaintiff bid its unit prices per linear foot. The linear foot measurement conditions were also emphasized to all prospective bidders at the pre-bid site showing and specifically to plaintiff at the pre-construction conference. Mr. Koepnick also conceded to this fact. *Id.* at 13. Further, Mr. Koepnick admitted that he had been informed by defendant that the contract would be on a linear foot basis due to the urgent nature of the job, the lack of personnel, and the fact that defendant had not completed surveying the project. *Id.* In addition, plaintiff's project supervisor, Mr. Glen Payne, was told of the linear foot arrangements by Mr. Koepnick. Therefore, plaintiff was fully informed and there should have been no confusion on its part.

**98**

## CONCLUSION

Upon the facts presented to the court, relevant case law and regulations, the court grants defendant's motion and denies plaintiff's motion. Counts one, four and five of plaintiff's First Claim are denied, as are parts of plaintiff's Second and Third Claims on the basis that such claims were not originally certified in plaintiff's original complaint to the contracting officer. Additionally, the remainder of plaintiff's claims are dismissed for failure to prove differing site conditions, estoppel, or any right to damages for delay. The Clerk of the Court is directed to dismiss the complaint accordingly. Costs.

IT IS SO ORDERED.