**NATIONAL STEEL AND SHIPBUILD-ING COMPANY, Plaintiff,**

v.

**UNITED STATES, Defendant.**

No. 96–112C.

United States Court of Federal Claims.

June 15, 2001.

A. Wayne Lalle, Jr., Venable, Baetjer and Howard, LLP, McLean, Virginia, attorney of record for the plaintiff, with whom was Charles W. Durant, of counsel.

Doris S. Finnerman, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., attorney of record for the defendant, with whom was David M. Cohen, Director.   Ann

G. Marra, Naval Sea Systems Command, of counsel.

## OPINION

HORN, Judge.

This case arises out of a government contract for the design and construction of the AOE–6 Class of Fast Combat Support Ships on which plaintiff, National Steel and Shipbuilding Company (NASSCO), was the prime contractor. NASSCO filed a complaint in this court challenging the final decision of the contracting officer denying plaintiff's request for an equitable adjustment of the contract. NASSCO submitted the request for equitable adjustment primarily on behalf of its first tier subcontractor, Jered Brown Brothers Inc. (JBB) and its second-tier subcontractor, YARD USA, Inc. (YUSA). Plaintiff bases its claim for equitable adjustment on delays incurred by it and its subcontractors due to alleged defective government specifications and the alleged late delivery or failure by the government to deliver government furnished equipment and government furnished information (collectively referred to as government furnished property). The total amount NASSCO claims it is due is $1,830,579.00, plus interest since July 23, 1990. Initially, the court held a trial on the limited issue of whether plaintiff's claim regarding delays arising from the lack of government furnished property is barred by an accord and satisfaction.

The parties agree that the issue before the court in the limited trial was whether contract Modification A00139, executed by the parties on March 7 and 8 of 1989, constituted an accord and satisfaction sufficient to discharge NASSCO's claim for all damages arising out of the lack of government furnished property. Based on the joint stipulations, the testimony of the witnesses presented at the trial and the exhibits entered into evidence, the court finds that Modification A00139 covers the management costs of handling, reviewing, negotiating and attempting to resolve the problems associated with the lack of government furnished property. For example, the Modification covers the costs of audits, exchanges of correspondence and developing supporting documentation. Modifi-

cation A00139, however, does not cover the actual delay costs arising out of the government's failure and, in part, alleged failure to make the government furnished property available to NASSCO and its subcontractors on schedule. The parties continued to negotiate the claims for delay costs caused by the lack of government furnished property after they executed Modification A00139, manifesting an intent that they did not settle those claims. Therefore, Modification A00139 did not act as an accord and satisfaction discharging NASSCO's claim for delay damages arising out of the lack of government furnished property.

## FINDINGS OF FACT

NASSCO was the prime contractor on Contract No. N00024–87–C–2002 for the design and construction of the AOE–6 Class of Fast Combat Support Ships. NASSCO was to construct one AOE–6 ship with a government option for three additional ships. The AOE–6 was to contain a steering system consisting of two parts, the machinery centralized control subsystem and the computerized steering control subsystem. The subcontractor for the steering system was JBB. JBB employed YUSA as a second-tier subcontractor to furnish and install the computerized steering control subsystem for the AOE–6 steering system. JBB designed and manufactured the machinery centralized control subsystem itself.

The government solicited bids for the contract on or about June 10, 1986. Bidders were to submit their offers on October 31, 1986. The government awarded the firm, fixed-price contract to NASSCO in the amount of $290,097,944.00 on January 23, 1987. The contract set the delivery date at fifty-one months after contract award, or April 23, 1991. The government later extended the date for delivery.

The contract specifications for the AOE–6 required a computer based steering control subsystem, anchored by an AN/UYK–44 computer. A steering control subsystem of this type was, at that time, unconventional. The AN/UYK–44 computer was a militarized computer, not a commercial computer, de-

signed to function in a stressful environment. A militarized computer was deemed important because the ship was certified to operate while being exposed to explosions of certain magnitudes.

To provide equipment and information for the AN/UYK–44 computer, the contract included Clause H–58(a), titled "Government-Furnished Property." The clause required the government to deliver to NASSCO certain equipment and information "described as Government-furnished property and in the Schedule or specifications, together with such related data and information as the Contractor may request and as may reasonably be required for the intended use of such property . . . ." The government was required to deliver to NASSCO property suitable for use by set dates. If the government failed to deliver such property in time, the contracting officer would equitably adjust the delivery date, the performance date and/or the contract price.

The contract also included Attachment J–9, "Schedule 'A' List of Government Furnished Material for AOE–6 Class Fast Combat Support Ships," and Attachment J–10, "Fast Combat Support Ship AOE–6 Government Furnished Information Schedule 'C,'" which listed specific government furnished property. The government furnished property listed in the attachments included one AN/UYK–44 computer for the AOE–6 steering control subsystem, one AN/UYK–44 Data Processing Set and nine technical manuals for the Data Processing Set. On July 21, 1987, NASSCO submitted a letter to the government on behalf of JBB requesting the government furnished property listed in Schedules A and C by specific dates. In addition to the government furnished property listed under the schedules, NASSCO also requested additional material and information, not in the contract, which YUSA believed it needed to complete the computer based steering control subsystem.

On July 23, 1987, NASSCO received the technical manuals from the government. However, items of government furnished property remained outstanding. On September 24, 1987, NASSCO again requested these items from the government. NASSCO followed up with similar letters to the government on October 14 and October 19 of the same year. On December 3, 1987, NASSCO submitted Contract Problem Report No. 17 (CPR–17)[1] to the government, which referenced its previous four letters requesting government furnished property, and repeated its need for the government furnished property.

To address the problems caused by the lack of government furnished property, the government began to consider installing a commercially available computer system in the AOE–6, instead of the militarized AN/UYK–44. The government described this option in Preliminary Engineering Change Proposal (ECP) H–051, which proposed eliminating all steering control subsystem government furnished property. Subsequently, the government asked NASSCO to prepare a report describing the cost consequences of instituting ECP H–051. NASSCO began preparing ECP C–014 in response. On January 25, 1988, however, the government canceled its request to prepare ECP C–014. As an alternative, the government asked NASSCO to submit it its own proposal for using commercially available parts for the AOE–6 steering control subsystem. Thus, NASSCO began to prepare ECP C–017.

The government continued to consider other methods of resolving the impact of the lack of government furnished property. In a February 23, 1988 meeting, the government decided to pursue three options: (1) install a commercially available processor in the AOE–6 steering control subsystem, thus eliminating the need for government furnished property (the option being investigated by NASSCO for ECP C–017); (2) try to

---

1. According to testimony offered by Derry Pence, a CPR is a vehicle by which a contractor can signal to the government that a problem has reached a more serious level and requires more immediate attention. Captain Pence, since retired, had spent twenty-six years in the Navy and had been involved in the AOE–6 shipbuilding program while in the service. He was the Program Manager's Representative for the Navy on the AOE–6 program from August 1987 to June 1992. From January 1993 to March 1995, he was the Navy's Project Manager for the AOE–6 program. At the time of the trial, however, he worked for NASSCO in its Repair Department.

find the necessary government furnished property and continue with the original plan to install the militarized AN/UYK–44 computer in the AOE–6 steering control subsystem; and (3) replace the computer based steering control subsystem with a conventional analog steering control subsystem. Finding that the first option was the least desirable, the government canceled its request for ECP C–017 on March 11, 1988.

During this period, the government suggested that NASSCO work on a proposal substituting a conventional, non-computerized steering control subsystem for the computer based steering control subsystem. On June 21, 1988, NASSCO submitted a Value Engineering Change Proposal (VECP)[2] to install a conventional steering control subsystem, instead of the computer based steering control subsystem.

Although both the government and NASSCO were beginning to move towards replacing the computerized steering control subsystem with a conventional steering control subsystem, the government continued to attempt to provide the government furnished property for the computerized steering control subsystem, as required under the original contract. On or about June 20, 1988, the government provided NASSCO with support software listed in NASSCO's July 21, 1987 letter. On July 21, 1988, The government shipped the AN/UYK–44 Military Reconfigurable Processor to YUSA's subcontractor. Finally, the Navy provided NASSCO with additional computer hardware on August 1, 1988.

In consideration of the cost of government furnished property, as well as the questions raised regarding the necessity for an advanced, computerized system on the AOE–6, the government formally accepted NASSCO's VECP on August 9, 1988 to install a

conventional steering control subsystem in the AOE–6, instead of a computerized steering control subsystem. As a result, NASSCO directed JBB and its subcontractors to stop all work on the computerized steering control subsystem. JBB, therefore, directed YUSA to stop work on the computerized steering control subsystem and terminated YUSA because its only responsibility on the contract was the computerized steering control subsystem and associated technical documentation.

The government's formal acceptance of the VECP resolved the issues relating to the government furnished property for the steering control subsystem by eliminating the need for the property and resolving CPR–17. NASSCO's VECP only included a rough estimate of the costs associated with the termination of the computerized steering control subsystem. The government's acceptance of the VECP did not finalize the costs associated with replacing the computer based steering control subsystem with a conventional, analog steering control subsystem.

On June 21, 1988, the same day that it submitted its VECP, NASSCO submitted a proposal and a number of supporting documents to the government entitled "Cancellation Costs—Steering System Processor and IC System Interface Mods—ECP C–017." NASSCO's proposal requested an increase in the total price of the contract of $690,920.00. The proposal stated that it included the cost of canceling both ECP C–014 and C–017, "NASSCO's costs and its subcontractor's cost in dealing with and attempting to resolve the problems associated with the steering system as identified in Contract Problem Report (CPR) 17 . . . and the resulting effects upon the AOE–6 program." On August 30, 1988, the government issued its own proposal,

---

**2.** According to the Federal Acquisition Regulations:

"Value engineering change proposal (VECP)" means a proposal that—

(a) Requires a change to the instant contract to implement; and

(b) Results in reducing the overall projected cost to the agency without impairing essential functions or characteristics; *provided,* that it does not involve a change—

(1) In deliverable end item quantities only;

(2) In research and development (R & D) items or R & D test quantities that are due solely to results of previous testing under the instant contract; or

(3) To the contract type only.

48 C.F.R. § 48.001 (1988) (emphasis in original). Agencies generally provide substantial financial incentives for contractors to develop and submit VECPs. *See* 48 C.F.R. § 48.102(a).

FMR–93,[3] which stated: "This change is issued to cover cancellation charges for ECP C–014 and ECP C–017."

On August 12, 1988, the government notified NASSCO that it wished to begin negotiating a settlement of the VECP, now identified as Headquarters Modification Request (HMR) 18 by the government,[4] by September 26 of that year. In the last quarter of 1988, the parties were negotiating two proposals, HMR–18 (generally regarding the VECP) and FMR–93 (generally regarding ECP C–014 and ECP C–017). HMR–18 and FMR–93 were linked in that the settlement of both proposals presumably would have addressed all costs associated with the deletion of the computer based steering control subsystem. NASSCO's VECP, numbered by the government as HMR–18, stated that:

Adjudication of this VECP, adjudication of NASSCO's proposal submitted by Reference (e) [NASSCO's June 21, 1988 proposal, numbered by the government as FMR–93] and Government acceptance of NASSCO's Request for Deviation (RFD) No. 119 submitted by Reference (f) will resolve all issues related to the steering gear and steering gear control system identified in Contract Problem Report (CPR) 17, as submitted by Reference (g). NASSCO's proposal submitted by Reference (e) covers NASSCO's costs in developing proposals requested by the Government in References (h) and (i) and subsequently cancelled in References (j) and (k), respectively [ECP C–014 and ECP C–017]. This proposal also covers NASSCO's costs and its subcontractors' costs in dealing with and attempting to resolve the problems associated with the steering system identified in CPR 17 and the resulting effects upon the AOE–6 Program.

On December 19, 1988, the government sent a letter to NASSCO asking the contractor to confirm that settlement of FMR–93 and HMR–18 would cover all costs relating to the deletion of the computerized steering control subsystem. NASSCO responded to the government on December 21, 1988, in a letter stating that:

1. FMR–93 (NASSCO Case 440–061.1) addressed costs associated with the Government's cancellation of requested ECP's C–014 and C–017 .... This case has been negotiated with the Government and a Supplemental Agreement is to be expected to be issued momentarily.

2. Separate and distinct from FMR–93 is NASSCO's VECP 440–079 (HMR–18) to delete entirely the AN/UYK–44 steering control system militarized microprocessor in favor of a conventional steering control system.... [A]djudication of FMR–93 and HMR–18 will address all costs associated with deletion of the computerized steering control system.

While the parties were negotiating FMR–93 and HMR–18, YUSA drafted its termination proposal for cancellation costs. YUSA submitted the proposal to JBB on November 28, 1988. YUSA's termination proposal included $2,108,379.00 for an equitable adjustment based on the government's failure to provide government furnished property and defective specifications. A portion of YUSA's request for equitable adjustment, $58,196.00, represented costs incurred due to the delay in the delivery of government furnished property relating to YUSA's work on the canceled ECPs. YUSA's request for equitable adjustment does not separate the costs attributed to the delays due to lack of government furnished property from the costs attributed to defective specifications. JBB submitted YUSA's termination proposal to NASSCO on December 1, 1988 and suggested that NASSCO ask the government to perform an audit of the termination proposal. NASSCO forwarded YUSA's termination proposal to the government on December 9, 1988 and asked the government to perform a "thorough" audit of the termination proposal

---

3. According to Derry Pence, the government's decision to issue FMR–93 was in order to use its own numbering system to track the change proposals. Thus, NASSCO's June 21, 1988 cost proposal and FMR–93 are the same proposal.

4. Similar to its decision to issue FMR–93, the government issued HMR–18 in order to use its own numbering system for tracking purposes. Thus, NASSCO's VECP and HMR–18 are the same proposal.

because, according to NASSCO, YUSA's settlement costs were far in excess of the value of the purchase order YUSA received from JBB for the computer based steering control subsystem. On January 6, January 23 and February 3, 1989, NASSCO forwarded correspondence from JBB to the government, which it considered useful to an audit of YUSA's termination proposal. NASSCO's letters repeatedly requested that the government perform an audit of YUSA's termination proposal. NASSCO's letters stated that the provided correspondence from JBB would be helpful to an understanding of the VECP. On March 10, 1989, NASSCO requested a response from the government to its letters regarding the audit.

On March 7, and March 8, 1989, NASSCO and the government, respectively, executed bilateral contract Modification A00139 to settle FMR–93. Category twelve of the executed Modification, titled Description of Agreement/Modification, reads:

> 2. Pursuant to contract Special Provision H–33, the Changes clause, and by mutual agreement of the parties, the contract target cost, target profit, target price, and ceiling price are adjusted as follows to cover cancellation charges related to ECPs C–014 and C–017 (which charges include, but are not limited to, costs resulting from the ordering, preparation, submission and cancellation of these ECPs), and to cover all costs related to the handling, resolution, or attempted resolution of the steering system problems, except those associated with Machinery Centralized Control System (MCCS) identified in Contract Problem Report (CPR) 17 and all impacts on the AOE–6 program resulting from these problems.

The Description of Agreement/Modification in category twelve continues in paragraph five, which states:

> 5. The Adjustments described above are considered to be fair and reasonable and have been agreed upon by the parties as full and final settlement of all claims and requests for equitable adjustment relating to or connected with this modification and the events, acts and omissions (if any) identified herein, including impact such as delay, acceleration, disruption, dislocation and cumulative effects. In consideration of the contract adjustment provided herein, the Contractor, for itself, its successors, assigns, vendors, suppliers and subcontractors, hereby remises, releases and forever discharges the Government, its officers, agents and employees from any and all claims and requests for equitable adjustment resulting from events, actions or omissions arising out of, under, in any matter connected with, or identified in this contract modification to the extent that they result in any extra costs or other impacts under this contract. This modification constitutes a complete and final adjustment of the price, delivery schedule and any other terms of this contract by reason of such events, actions or omissions. The Contractor hereby expressly represents and acknowledges that in agreeing to the adjustments contained herein, it has considered and made allowance for every cost to which it is, or may be entitled by reason of such events, actions or omissions, whether or not such costs are known or unknown or foreseeable or unforeseeable to either or both of the parties as of the date of this modification, without regard to whether such costs were, or are, incurred before or after the date of said events, actions or omissions, or after the date of this modification and whether or not such costs have been discussed with, or for any reason reserved for future discussion with the Government, or made the basis for other assertion of claims. This release includes, but is not limited to, any and all delay (direct and cumulative) and the costs thereof, all costs of dislocations, disruptions (local and cumulative), accelerations (direct and cumulative), proposal preparation and inefficiencies in performance, and all overhead costs (including, without limitation, unabsorbed overhead), whether any of such costs are caused directly by, indirectly by, cumulatively by or in consequence of the impact of any events, actions or omissions under this contract.

Finally, another portion of Modification A00139, later in the document, titled "GENERAL DESCRIPTION," reads that "[t]his

change was issued to cover cancellation charges for ECP C–014 and ECP C–017."

Contrary to the "GENERAL DESCRIPTION" included in Modification A00139, the Modification also addressed costs in addition to those costs incurred by NASSCO and its subcontractors while preparing the ECPs. For example, Contract Modification A00139 included costs for cutting access holes in the ship's hull to install the steering control subsystem. According to Derry Pence, normally, a contractor would install a steering control subsystem at a time when the hull of the ship was still open. NASSCO had already sealed the ship's hull when the government decided to switch to a conventional steering control subsystem. Therefore, NASSCO had to open the ship's hull to install the steering control subsystem. The cost of opening the hull was shifted to FMR–93 to ensure that the VECP would result in a savings to the government. According to Mr. Pence, if the VECP resulted in a cost to the government, it would be termed an ordinary engineering change proposal. Mr. Pence stated that it was more advantageous for the parties to resolve the lack of government furnished property through a VECP because it was easier to convince decision-makers in the government to accept the change to a conventional steering control subsystem if the change resulted in a savings to the Navy. According to Mr. Pence, the extra cost of opening the ship's hull is reflected in the fact that the price of $408,658.00 for Modification A00139 was over and above the amount that normally would be expected for the cancellation of two ECPs. In addition, Mr. Pence testified that the price summary in Modification A00139 reflects many more "man-hours" than would be expected for the creation of two ECPs. At the trial, Martin Stoops, manager of contracts for NASSCO from the beginning of the contract until October 1988,[5] agreed that "some costs relating to government furnished property" were included in Contract Modification A00139. Mr. Stoops

did not indicate, however, what specific costs related to government furnished property were included in the Modification.

Contract Modification A00139 specifically excluded costs associated with the VECP's impact on the machinery centralized control subsystem. According to CPR–17, the computerized steering control subsystem was not the only system delayed due to lack of government furnished property. The machinery centralized control system also was delayed due to the government's late delivery or failure to deliver government furnished property. This cost, however, was clearly excepted from the cost of Modification A00139, which stated that the price increase would, "cover all costs related to the handling, resolution, or attempted resolution of the steering system problems, except those associated with Machinery Centralized Control System (MCCS) identified in Contract Problem Report (CPR) 17 and all impacts on the AOE–6 program resulting from these problems."

During its performance of the contract, NASSCO submitted claims to the government for its own costs, allegedly amounting to approximately $440,000,000.00. NASSCO and the government conducted negotiations surrounding NASSCO's claims during 1990 and 1991. According to the testimony of Mr. Pence (a government witness) and Mr. Caskey (a NASSCO witness), the parties appear to have agreed to negotiate subcontractor claims at a later time. According to the government witness, Mr. Pence, one of the subcontractor claims which the parties specifically set aside was the request for equitable adjustment from YUSA, which had been passed on through JBB, based on late government furnished property and defective specifications.

On behalf of JBB and YUSA, NASSCO submitted a certified claim to the government on July 23, 1990, in the amount of $3,313,899.00, for delays resulting from the

5. Mr. Stoops was NASSCO's manager of contracts administration from the time the AOE–6 contract was awarded until October 1988. From approximately October 1988 until he returned to contract administration in January 1990, he was in another position in the company, with little direct involvement in the AOE–6 program. Mr.

Stoops, however, was the author, while not the signatory, of NASSCO's June 21, 1988 cost proposal for the cancelled ECPs, also known as FMR–93, and the VECP, also known as HMR–18. In addition, Mr. Stoops continued to have oversight of the AOE–6 program during his transition period following October 1988.

untimely delivery of government furnished property for the computerized steering control subsystem, defective specifications and stop work costs. The claim included the full amount of YUSA's request for equitable adjustment. The claim further included JBB's costs associated with YUSA's request for equitable adjustment through April 12, 1989. The claim also appears to have included costs attributable to NASSCO, as the equitable adjustment requested by NASSCO was over and above the combined equitable adjustments requested by JBB and YUSA. NASSCO also retained the right to modify the claim as further data became available.

According to NASSCO, costs included in the certified claim submitted on behalf of JBB and YUSA were removed from HMR–18.[6] These costs included the delay costs arising from lack of government furnished property. On February 28, 1991, the government issued a technical audit report of YUSA's request for equitable adjustment. The audit recommended a total equitable adjustment of $1,316,200.00. A previous audit of YUSA's termination proposal, performed for JBB by Price Waterhouse, had recommended an equitable adjustment of $425,432.00.

On November 11, 1992, NASSCO submitted an updated certified claim in the amount of $2,346,285.00. According to the updated certified claim, the reduction in the price of the claim reflected "negotiations between NASSCO, JBB and YUSA and the settlement agreements reached between these parties." The updated claim included costs for NASSCO, JBB and YUSA. In response to NASSCO's new certified claim, the government performed and issued another audit on June 16, 1993. The second government audit encompassed NASSCO's entire request for equitable adjustment submitted in the updated certified claim. According to Jeffre Thrasher, procuring contracting officer for the AOE–6, government audits such as those performed on YUSA's request for equitable adjustment and NASSCO's certified claim are performed as a matter of procedure with any request for equitable adjustment, contract or initiated proposal. On July 13, 1993, eight months after NASSCO submitted its updated claim, the government advised NASSCO that it regretted the delay in the resolution of the certified claim for equitable adjustment. It also stated that "[d]ue to the complexity of this claim additional time is required to process it" and "that efforts [were] being made for a reasonable resolution."

Mr. Thrasher became the contracting officer for the AOE–6 in October of 1992 and continued in that position until the end of 1996. According to Mr. Thrasher, when he began, he believed that he identified outstanding subcontractor claims totaling approximately $60,000,000.00. In addition, at that time, the government and NASSCO still had not settled HMR–18. Mr. Thrasher stated that it was his goal to settle all of the remaining claims with one global settlement which would include a full and final release. Mr. Thrasher began a technical audit to build a file of any and all information regarding claims "still on the table." Subsequently, beginning around June 1, 1994, and continuing through October 12, 1994, the government made several requests for information to NASSCO, asking for additional information related to NASSCO's certified claim for equitable adjustment.

At the beginning of 1995, there was increased pressure from the Department of the Navy, Naval Sea Systems Command on Mr. Thrasher to settle NASSCO's certified claim for equitable adjustment. On February 17, 1995, the government sent NASSCO another letter expressing regret at the delay in the issuance of a contracting officer's final decision on NASSCO's certified claim for equitable adjustment. The letter stated that "[t]he complexity of the claim necessitates an extension of the COFD [contracting officer's final decision] date." In the summer of 1995, the parties began to negotiate HMR–18 and to discuss the certified claim for late government furnished property. Mr. Thrasher offered to settle HMR–18 for approximately $1,600,000.00. NASSCO made a counter-offer for $2,000,000.00. Mr. Thrasher made

---

6. According to the testimony of Maurice Caskey, the NASSCO contract manager, who testified for the plaintiff, the stop work costs were eventually shifted back to HMR–18.

another offer for $1,900,000.00, which NAS-SCO also rejected.

Mr. Thrasher testified that he had placed no value on NASSCO's certified claim for equitable adjustment when he made the offer to NASSCO. A condition of the offer, however, was a release by NASSCO of its certified claim for equitable adjustment. In addition, Mr. Thrasher testified that his offer exceeded NASSCO's requested cost for HMR–18. NASSCO's requested cost for HMR–18 at the time Mr. Thrasher made the offer was $1,200,000.00, approximately $400,000.00 less than the amount Mr. Thrasher offered.[7] Mr. Thrasher stated that the extra amount was for a full and final settlement of the issues, including a release by NASSCO of its certified claim for equitable adjustment.

Maurice Caskey, the manager of new construction contracts administration at NAS-SCO, negotiated with Mr. Thrasher for the plaintiff. Mr. Caskey characterized the negotiations between the parties over HMR–18 differently than Mr. Thrasher. Mr. Caskey testified that in 1992, JBB and NASSCO entered into a settlement agreement involving YUSA's termination proposal which included YUSA's request for equitable adjustment. According to Mr. Caskey, NASSCO agreed that it would pay JBB for the termination costs outside of YUSA's request for equitable adjustment, and JBB had a right of refusal to accept or reject the contracting officer's final decision regarding the cost of YUSA's request for equitable adjustment, contained in NASSCO's certified claim. According to Mr. Caskey, Mr. Thrasher's offer of $1,600,000.00 was for HMR–18, with the understanding that part of the offer would flow through to JBB to pay for YUSA's request for equitable adjustment, which included delay costs due to the lack of government furnished property.

In negotiations between NASSCO and the government during June of 1995, the government raised the possibility that NASSCO's claim for delay costs resulting from the lack of government furnished property may be barred by Modification A00139. This was the first time that the government raised this issue with NASSCO. On August 8, 1995, the Administrative Contracting Officer, Roy A. Hussak, issued a final decision denying NAS-SCO's entire claim for equitable adjustment, concluding, in part, that NASSCO's claim for delay damages arising out of the lack of government furnished property had been discharged by Modification A00139.

On November 10, 1995, as requested by Mr. Thrasher, Mr. Caskey sent a chronology of the negotiations between NASSCO and the Navy to the defendant, so that the government could respond to a query from the Senate Armed Services Committee. The introduction to the chronology stated that the negotiations concerned NASSCO's certified claim for equitable adjustment. The NAS-SCO chronology stated that on June 12, 1995, the government had met with NASSCO to conduct negotiations to settle the certified claim for equitable adjustment. Furthermore, the chronology stated that the government offered NASSCO $1,650,000.00, in part, to settle the certified claim for equitable adjustment. In his testimony at the trial, Mr. Thrasher contested this statement, insisting that his offer did not include money for the certified claim for equitable adjustment. He had not previously responded to the submission submitted by Mr. Caskey.

On June 14, 1996, the parties executed Modification P00063, which settled HMR–18. The Modification specifically excluded NAS-SCO's certified claim for equitable adjustment. In this regard, Modification P00063 stated:

PRESERVATION OF RIGHTS; STEERING SYSTEM CLAIM—The settlement subject of this modification does not include NASSCO Case 440–378 [NAS-SCO's request for equitable adjustment on the delays arising from the lack of government furnished property and defective specifications on the AOE–6 contract]. The COFD [contracting officer's final decision] issued 08 August 1995 remains the Government's position for the claim's resolution. Nothing in this mutual settlement of claim matters shall prejudice the rights of either party hereto, including NAS-

7. *Ultimately, the government paid $935,527.00*   for HMR–18.

SCO's steering system subcontractor Jered Brown Brothers Inc., regarding any remedy which might be available in response to that COFD.

The parties included $935,257.00 as part of Modification P00063 to settle the costs associated with YUSA's termination. Mr. Caskey testified that the value of the termination was based, in part, on an estimate of NASSCO's certified claim for equitable adjustment arising out of defective specifications and delay damages from the lack of government furnished property, valuing the claim at $1,300,000.00.[8] According to Mr. Caskey, if the parties had valued the certified claim for equitable adjustment at a lower figure, the loss to the contractor would have been greater. In addition, Mr. Caskey testified that NASSCO had explained to the government, in writing, how it had arrived at the amount of $935,000.00 for termination costs. Although NASSCO had tried to explain the relationship between the equitable adjustment and the termination cost in a letter sent to the government on June 14, 1990, the court cannot find, in the documents submitted to the court, a direct statement that the parties used $1,300,000.00 as the amount of NASSCO's certified claim for equitable adjustment in arriving at the figure for YUSA's termination costs settled in P00063. However, NASSCO submitted JBB's request for equitable adjustment in support of HMR–18, which stated that it valued YUSA's equitable adjustment at around $1,300,000.00. Thus, it appears that NASSCO may have used this figure in arriving at its evaluation of YUSA's termination costs in HMR–18. Moreover, HMR–18 includes $935,527.00 for termination costs, the same amount as settled by the parties in Modification P00063. This also suggests that the parties appear to have used $1,300,000.00 as the estimate of NASSCO's certified claim for equitable adjustment in their determination of YUSA's termination costs for Modification P00063.

8. Mr. Caskey explained the basis of his statement with the following formula for determining the terminated contractor's profit or loss on the completed portion of the contract in order to arrive at a termination settlement. Mr. Caskey explained that by adding the cost of the work performed to the estimated cost to complete the project, one would arrive at an estimate of the

## DISCUSSION

The parties have stipulated that the issue currently before the court is whether Modification A00139 operates as an accord and satisfaction discharging NASSCO's claim for delay damages arising from the lack of government furnished property in its entirety. Defendant argues that NASSCO's claims for all delay damages related to the lack of government furnished property were discharged by Contract Modification A00139. Plaintiff contends that Modification A00139 only settled the costs of preparing ECP C–014 and ECP C–017 and the costs of attempting to resolve the lack of government furnished property, but not the delay costs resulting from the government's failure and alleged failure to deliver the government furnished property on schedule.

Due primarily to the extended negotiations between the parties to resolve the dispute between them at the agency level, the additional time the contracting officer used to deliver a final decision on NASSCO's certified claim for equitable adjustment, including NASSCO's delay claims arising out of the lack of government furnished property, and an elongated discovery period requested by the parties in the case filed in this court, trial of the instant issue occurred more than ten years after the alleged accord and satisfaction. Significantly, NASSCO's negotiator for Modification A00139, Len Monzon, passed away prior to the trial. In addition, at the trial, it was apparent at the trial that time had affected the memories of a number of the witnesses, most obviously the government's negotiator for Modification A00139, Haruo Tayama. His testimony was vague and fractured. Moreover, several of the parties' witnesses seemed to be too emotionally vested in their respective versions of the facts to offer objective recollection of the events in question. Examination of the fac-

total cost of the project had the contract not been terminated. Next, the parties would determine the ratio of profit or loss by comparing the estimate of the total cost to the price of the contract, arriving at a profit or loss adjustment. This ratio would then be applied to the cost of the work performed to determine the actual profit or loss to which the contractor should be entitled.

tual record presented by the parties also reveals critical gaps in the presentations offered by both parties and their respective witnesses. Much of the supporting documentation was very technical in nature, with the same item being referenced with different labels by the parties, and explained only vaguely by the witnesses. Consequently, the court found the oral testimony and the technical documentary evidence challenging to analyze and not entirely consistent.

After carefully evaluating and reevaluating the evidence including the credibility of each of the witnesses who testified, the court has concluded, as discussed below, that Modification A00139, and the proposals which preceded it, demonstrate that the parties intended to distinguish between costs arising out of attempts to manage the lack of government furnished property and the delay costs arising out of the actual lack of government furnished property due to the failure and alleged failure of the government to make the government furnished property available on schedule. In addition, the parties conduct following Modification A00139, particularly the government's audits of NASSCO's certified claim for equitable adjustment, the government's review of the merits of NASSCO's certified claim, the fact that the government did not raise the defense of accord and satisfaction until five years after NASSCO submitted its certified claim and the government's offer to settle NASSCO's certified claim, manifested an intent that the parties had not settled the costs for delays arising out of the lack of government furnished property in Modification A00139.

■ "Accord and satisfaction denotes 'one of the recognized methods of discharging and terminating an existing right' and constitutes 'a perfect defense in an action for the enforcement of a previous claim, whether that claim was well-founded or not.'" *Chesapeake & Potomac Tel. Co. v. United States,* 228 Ct.Cl. 101, 108, 654 F.2d 711, 716 (1981) (quoting 6 *Corbin on Contracts* § 1276 (1962)); *Safeco Credit v. United States,* 44 Fed.Cl. 406, 419 (1999); *Valcon II, Inc. v. United States,* 26 Cl.Ct. 393, 396 (1992). Accord and satisfaction is an affirmative defense, meaning that the government bears the burden of proof. *See* Fed. Cl. R. 8(c); *e.g. Westerhold v. United States,* 28 Fed.Cl. 172, 175 (1993). "An accord is an agreement by one party to give or perform and by the other party to accept, in settlement or satisfaction of an existing or matured claim, something other than that which is claimed to be due." *Chesapeake & Potomac Tel. Co. v. United States,* 228 Ct.Cl. at 108, 654 F.2d at 716 (quoting 1 *Am.Jur.2d Accord and Satisfaction* § 1 (1962)); *Spirit Leveling Contractors v. United States,* 19 Cl.Ct. 84, 92 (1989). "Satisfaction means 'the evolution or performance of the agreement, or actual giving and taking of some agreed upon things.'" *Robinson Contracting Co. v. United States,* 16 Cl.Ct. 676, 685 (1989), *aff'd,* 895 F.2d 1420, 1990 WL 807 (Fed.Cir.1990) (table). "As the term 'accord and satisfaction' indicates, both an accord and satisfaction are necessary to bar a claim." *Id.* The elements of an accord and satisfaction are: (1) proper subject matter; (2) competent parties; (3) a meeting of the minds of the parties; and (4) consideration. *Brock & Blevins Co. v. United States,* 170 Ct.Cl. 52, 58–59, 343 F.2d 951, 955 (1965) (quoting *Nevada Half Moon Mining Co. v. Combined Metals Reduction Co.,* 176 F.2d 73, 76 (10th Cir.1949), *cert. denied,* 338 U.S. 943, 70 S.Ct. 429, 94 L.Ed. 581 (1950)); *see also Mil–Spec Contractors, Inc. v. United States,* 835 F.2d 865, 867 (Fed.Cir.1987); *Safeco Credit v. United States,* 44 Fed.Cl. at 419; *Valcon II, Inc. v. United States,* 26 Cl.Ct. at 396; *King Fisher Marine Serv., Inc. v. United States,* 16 Cl.Ct. 231, 236 (1989). If the defendant fails to establish the existence of any of these basic elements, the defense fails. In this case, the parties agree that Modification A00139 was on a proper subject matter, that the parties were competent and that there was adequate consideration. The only element at issue is whether there was a meeting of the minds.

■ A meeting of the minds occurs when there are "accompanying expressions sufficient to make the creditor understand, or to make it unreasonable for him not to understand, that the performance is offered to him as full satisfaction of his claim and not otherwise." *Chesapeake & Potomac Tel. Co. v. United States,* 228 Ct.Cl. at 109, 654 F.2d at

716 (citing 6 Corbin on Contracts § 1277); *see also McDonald v. United States,* 13 Cl. Ct. 255, 260–61 (1987). If this is not the case, there is no agreement because there was no valid offer and acceptance. *Chesapeake & Potomac Tel. Co. v. United States,* 228 Ct.Cl. at 109, 654 F.2d at 716. In determining whether the creditor knew or should have known that the offered accord encompassed the contested claim, the court should look to the totality of the circumstances. *See Texas Instruments Inc. v. United States,* 922 F.2d 810, 815 (Fed.Cir.1990) (stating that a meeting of the minds is determined by looking at the totality of the circumstances). The circumstances show that the parties did not have a meeting of the minds with respect to delays arising out of the lack of government furnished property.

The terms of Modification A00139 do not evidence a belief by NASSCO that the delay costs at issue in this case, resulting from the lack of government furnished property, were settled by the parties. Nor do the circumstances establish that NASSCO should have understood that the costs at issue were settled by the parties. Review of the circumstances surrounding Modification A00139, together with the language of the Modification reveal a distinction between delays arising out of attempts to manage the resolution of the lack of government furnished property problem, which are covered in Modification A00139, and delays arising from the lack of government furnished property.

Paragraph two of Modification A00139 states that:

> The contract target cost, target profit, target price, and ceiling price are adjusted as follows to cover cancellation charges related to ECPs C–014 and C–017 (which charges include, but are not limited to, costs resulting from the ordering, preparation, submission and cancellation of these ECPs), and to cover all costs related to the handling, resolution, or attempted resolution of the steering system problems, except those associated with Machinery Centralized Control System (MCCS) identified in Contract Problem Report (CPR) 17 and all impacts on the AOE–6 program resulting from these problems.

The paragraph delineates three different classes of costs. It begins by introducing those costs which are included in Modification A00139. The first class of costs is the cancellation charges related to the ECPs. These costs are limited to the ECPs and do not concern the delay costs associated with the lack of government furnished property at issue in this case. The next paragraph lists the second class of costs, related to the handling, resolution, or attempted resolution of the steering system problems. These costs are one of the sets of costs arising out of the lack of government furnished property. They are, however, limited to the costs of managing the lack of government furnished property. As stated, the costs relate to handling, resolution or attempted resolution of the problem. For example, the costs of attempting to track down the government furnished property via correspondence with the government, the costs of supporting audits, or the cost of assessing the ramifications of the lack of government furnished property would be included under this section; the costs of delay from the actual lack of government furnished property would not be included. This second class of costs is separated from the costs relating to the ECPs by a comma and the word "and," signaling that the second class of costs, the management costs, are the last costs in a list of included costs. The third class of costs mentioned in the paragraph relates to those costs associated with the machinery centralized control subsystem and all impacts on the AOE–6 resulting from the problems with the machinery centralized control subsystem. These costs do not concern the cost of delays resulting from the lack of government furnished property for the computerized steering control subsystem, which plaintiff claims in the suit in this court. The third class of costs is preceded by the word "except," showing that it is not a part of the list of included costs detailed in Modification A00139.

Paragraph five of Modification A00139 includes release type language which states:

> The Adjustments described above are considered to be fair and reasonable and have been agreed upon by the parties as full and final settlement of all claims and re-

quests for equitable adjustment relating to or connected with this modification and the events, acts and omissions (if any) identified herein, including impact such as delay, acceleration, disruption, dislocation and cumulative effects.

Paragraph five broadens the first class of costs to include the delays associated with preparing the ECPs, and the second class of costs to include delays arising out of the attempts to manage or resolve the lack of government furnished property problem, not the cost of delays from the actual lack of government furnished property. The language of paragraph five does not expand Modification A00139 to include additional types of costs not identified in the previously discussed paragraph two. In this regard, the release language affects "any and all claims and requests for equitable adjustment resulting from events, actions or omissions arising out of, under, in any matter connected with, or identified in this contract modification...." The definitional touchstone, therefore, is the descriptive language in paragraph two, and not the release language in paragraph five.

The government has contended that the issue before the court is not the scope of the release, but the scope of the Modification. The defendant has argued that Modification A00139 describes an additional class of costs. The government contends that the phrase, "and all impacts on the AOE–6 program resulting from these problems" is separate and distinct from the costs associated with the machinery centralized control subsystem. Under the government's interpretation, the "problems" referenced at the end of paragraph two also include those problems identified in CPR–17, which addresses the lack of government furnished property for the steering control subsystem. The defendant tries to create an additional class of costs in paragraph two, defined as the cost of impacts on the AOE–6 program resulting from the lack of government furnished property for the steering control subsystem. Defendant believes that while the third class of costs, machinery centralized control system costs, were excluded from the Modification, this additional class of costs, allegedly relating to costs arising from the lack of government furnished property, were included in the Modification.

Unlike the government, the court reads the language of paragraph two of Modification A00139 as split into two sections. The first section involves the costs which Modification A00139 intends to include. The included costs are those related to the ECP's and those related to the attempted resolution of the lack of government furnished property for the steering control subsystem. As noted above, the two costs are separated by a comma as well as the word "and." Grammatically, the last item in a list is separated from the previous items by an "and" signaling the termination of the list. Thus, the costs of handling, resolving or attempting to resolve the steering control problem is the last cost item that is included in Modification A00139. The second section of paragraph two concerns the costs excluded from the Modification, signaled by the fact that the section is introduced by the word "except." This section addresses the costs associated with the machinery centralized control subsystem.

The last portion of paragraph two, the portion in which defendant contends the delay costs related to the lack of government furnished property for the steering control subsystem are located, only refers to one class of costs, the costs related to the machinery centralized control system and the impacts on the AOE–6 program from that problem. Beginning with the word "except," paragraph two continues without a comma until it ends. That there is no comma signals that the portion of the paragraph contains only one concept. Thus, the word "problems," located at the end of paragraph two, should be read as relating to the preceding discussion regarding the machinery centralized control system, not to the lack of government furnished property problem referenced in CPR–17.

■ A well established rule of contract interpretation states that a court must give reasonable meaning to all parts of the contract and not render portions of the contract meaningless. *See McAbee Constr., Inc. v. United States,* 97 F.3d 1431, 1434 (Fed.Cir.

1996), *reh'g denied,* No 96–5004 (Fed.Cir. March 13, 1996); *Fortec Constr. v. United States,* 760 F.2d 1288, 1292 (Fed.Cir.1985) (citing *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1555 (Fed.Cir.1983)). Defendant reads the last portion of the Modification as covering "all impacts on the AOE–6 program resulting" from the lack of government furnished property. Defendant's interpretation, however, is too broad. If the last portion of Modification A00139 included "all impacts on the AOE–6 program resulting" from the lack of government furnished property, that same portion would also include the costs of handling, resolving or attempting to resolve the lack of government furnished property. Those costs are discussed specifically in the Modification. Therefore, accepting defendant's interpretation of the Modification would render meaningless the earlier portion of the Modification, which include specifically the management costs of responding to the lack of government furnished property.

Moreover, in order to accept the defendant's interpretation, paragraph two of Modification A00139 would be read as discussing, sequentially, two classes of costs which are included, one class of costs which is excluded and then another class of costs which is included. Defendant's interpretation does not follow the logical structure of the paragraph in which the classes of included costs are discussed first and the class of excluded costs is presented second.

■ Defendant argues that because the final portion of the Modification referenced the CPR–17, namely the machinery centralized control system, it also referenced the problem of lack of government furnished property discussed in CPR–17. Defendant overlooks the rule that, "[i]n other cases of express agreements in writing, a reference by the contracting parties to an extraneous writing for a particular purpose makes it a part of their agreement only for the purpose specified." *Guerini Stone Co. v. P.J. Carlin Constr. Co.,* 240 U.S. 264, 277, 36 S.Ct. 300, 60 L.Ed. 636 (1916); *First Nat'l Bank v. United States,* 846 F.2d 740, 742–743 (Fed. Cir.), *cert. denied,* 488 U.S. 893, 109 S.Ct. 231, 102 L.Ed.2d 221 (1988). The extent to which CPR–17 is read into the contract is limited to the purpose for which it is mentioned. CPR–17 is referenced only as a means of describing the excluded costs related to the machinery centralized control system. CPR–17 may be read into Modification A00139, but only as a means of explaining the costs related to the machinery centralized control system which were excluded from the Modification.

■ In addition to the words of Modification A00139, NASSCO's proposals dated August 8 and August 11, 1988, which led up to Modification A00139, do not show that NASSCO believed or that it should have believed that the delay costs relating to the lack of government furnished property for the steering control subsystem were settled by the parties in Modification A00139. Similar to the Modification, the proposals evidence a distinction between those costs resulting from the efforts to manage or resolve the government furnished property problem and the costs of the delays resulting from the actual lack of government furnished property. The proposals and ensuing discussions and negotiations are important in that a settlement operates as an accord and satisfaction only as to those claims considered during the settlement process. *See Tri–O, Inc. v. United States,* 28 Fed.Cl. 463 (1993); *Chantilly Constr. Corp.,* A.S.B.C.A. 24, 138, 81–1 B.C.A. ¶ 14,863 (1980). If the parties did not discuss the delays resulting from the actual lack of government furnished property problem in their proposals, the court cannot find that the contractor knew or should have known that the Modification foreclosed those claims.

NASSCO's first proposal for what eventually became Modification A00139, dated August 8, 1988 and renamed FMR–93 by the government, stated that the proposal covered "NASSCO's costs and its subcontractor's cost in dealing with and attempting to resolve the problems associated with the steering system as identified in Contract Problem Report (CPR) 17 . . . and the resulting effects upon the AOE–6 Program." NASSCO's August 11, 1988 proposal, its VECP, which was renamed HMR–18 by the government, also describes the costs contained in FMR–93 as

"NASSCO's costs and its subcontractors costs in dealing with and attempting to resolve the problems associated with the steering system as identified in Contract Problem Report (CPR) 17 ... and the resulting effects upon the AOE–6 program." The identical language restricts FMR–93 to those costs relating to attempts to. deal with and resolve the lack of government furnished property problems relating to the steering control subsystem and the effects of those attempts on the AOE–6 program. The language referring to the resulting effects on the AOE–6 program broadens the proposal slightly to include delays caused by the parties' efforts to reach a resolution of the lack of government furnished property problem. Neither FMR–93, nor the description of FMR–93 in HMR–18, mention delays resulting from the actual lack of government furnished property. A broader reading of the language in FMR–93, and the description of FMR–93 in HMR–18, as including in FMR–93 the costs of all of the impacts on the AOE–6 program from the problems noted in CPR–17, would nullify the earlier portion of the description regarding the management cost of dealing with the lack of government furnished property. Similar to the interpretation of Modification A00139 outlined above, the costs of dealing with and attempting to resolve the lack of government furnished property problems in CPR–17 represent one of the sets of costs resulting from the total impact of the lack of government furnished property.

NASSCO also · included a letter from YUSA with its June 21, 1988 proposal, the same proposal designated as FMR–93 by the government, supporting the distinction between the management costs of dealing with the lack of government furnished property and the costs arising from the actual lack of government furnished property. The letter stated:

> Delay to date costs of $58,196.00 are attributable to preparation of correspondence associated with lack of GFE/GFI on the part of YARD USA, Inc., and its affiliates and subcontractor; assessment of program impact of such delinquent items; assessment of plausible alternate project

activities to minimize total project impact, and the accounting for such delays.

The activities which YUSA identified in the letter as causing delays relate to the actions taken by its employees in trying to resolve the lack of government furnished property and not the lack of government furnished property itself. According to the letter from YUSA, it was delayed because some of its employees were preparing correspondence, trying to determine the impact of the items, deciding how to pursue other project activities and tabulating the delays. They were not working on their usually assigned tasks. The letter does not describe delays due to the actual lack of government furnished property.

Through its witnesses at the trial, the government attempted to show that Modification A00139 included delay and disruption costs arising from the lack of government furnished property. Some delay and disruption costs were covered by the Modification. The second page of the price summary, included as part of Modification A00139, allocates 1100 added hours for unspecified "local DD & A [delay, disruption and acceleration.]" Furthermore, the government has pointed to NASSCO's June 21, 1988 proposal, also known as FMR–93, which eventually was settled with Modification A00139. NASSCO submitted a number of supporting documents with the proposal including a "Change Order Estimate Summary" showing 3,086 hours of delay and disruption resulting from "production." And, NASSCO also attached a NASSCO Inter–Department Memo to FMR–93 noting 177 hours for delay, disruption and acceleration involving engineering. Finally, in FMR–93, NASSCO included a worksheet of delay and disruption impacts from the cancellation of ECP C–017. At the trial, however, it was not established that these delay costs arose from the actual lack of government furnished property for the steering control subsystem. Modification A00139 also included the cost of preparing ECP C–014 and ECP C–017 as well as the cost of opening the hull to install the steering control system in the ship. These actions would have caused compensable delays, the cost of which could have been covered in Modification A00139. From the testimony and the

exhibits offered, it is not possible to discern the source of the delays. In Modification A00139, they are merely labeled as "delay and disruption" costs and not described in any degree of detail. Nor did the witnesses at the trial illustrate a concrete connection between the delay and disruption costs included in the proposals and the costs of delays arising from the actual lack of government furnished property. The burden of proof is on the government and it has not proven that the delay costs described in the testimony or the exhibits introduced by the parties were derived from the government's failure and alleged failure to provide government furnished property on schedule.

In addition to evidence offered from periods before and during the execution of Modification A00139, the government's consideration of NASSCO's claim after the settlement bars the defense of accord and satisfaction. *See Cmty. Heating & Plumbing Co. v. Kelso,* 987 F.2d 1575, 1581 (Fed.Cir. 1993); *Winn–Senter Constr. Co. v. United States,* 110 Ct.Cl. 34, 66, 75 F.Supp. 255, 260 (1948); *Metric Constr. Co. v. United States,* 1 Cl.Ct. 383, 396–97 (1983). " 'Such conduct manifests an intent that the parties never construed the release as an abandonment of plaintiff's earlier claim." ' *Cmty. Heating & Plumbing v. Kelso,* 987 F.2d at 1581 (quoting *A & K Plumbing and Mechanical, Inc. v. United States,* 1 Cl.Ct. 716, 723 (1983)). In *Community Heating & Plumbing,* the contractor claimed that a 474–day work delay caused by the Navy resulted in an increase in the cost of completing the contract. *Id.* at 1580–81. The Armed Services Board of Contract Appeals (ASBCA) found that an accord and satisfaction had occurred based on a series of contract modifications. *Id.* at 1581. The United States Court of Appeals for the Federal Circuit, however, barred the defense of accord and satisfaction because the conduct of the parties following the modifications showed that they never intended to include the claim for delay in the modification. *Id.* Specifically, the Federal Circuit focused on the fact that the Navy, "administered, reviewed, and negotiated Community's claims on its merits prior to and after execution of the subject contract negotiations and waited

more than two and one-half years to first raise the defense of accord and satisfaction." *Id.* at 1581 n. 7.

Not every discussion of a claim following a settlement or modification, however, will bar the defense of accord and satisfaction. The relevance in this case of the post-modification conduct is dependent on its ability to indicate the intentions of the parties at the time they entered into the modification. *See id.* at 1581. In *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1388 (Fed.Cir.1987), the court addressed a contractor's claim for damages arising out of a contract for construction of a road. Before receiving final payment, Mingus executed a Release of Claims form. *Id.* at 1389. Following the execution of the release, the contractor sought confirmation from the government that it had not waived and had properly excepted its claims from the release. *Id.* The contracting officer responded by outlining the proper procedures for excepting a claim. *Id.* The court found that the actions by the contracting officer reiterating the general method for excepting claims did not "constitute plain conduct indicating a post-release consideration of Mingus's claims." *Id.* at 1395.

The defendant argues that post-settlement evidence may not be used to bar the defense of accord and satisfaction with regard to a modification. In closing argument, the defendant alleged generally, without naming specific cases, that the relevant law concerning post-settlement evidence only applies to global releases subsequent to final payment. *Community Heating & Plumbing,* however, involved a series of contract modifications and releases. 987 F.2d at 1581. Although *Community Heating & Plumbing* did not involve a final, global release, the Federal Circuit did not hesitate to find that the defense of accord and satisfaction was barred by the government's post-settlement conduct. *Id.*

The government's conduct following the execution of Modification A00139 manifests an intent to exclude the claim for delay resulting from the lack of government furnished property from Modification A00139.

In this regard, the facts brought out at the trial bear a resemblance to those in *Community Heating and Plumbing*.

In *Community Heating & Plumbing*, the government waited two and a half years to raise the defense of accord and satisfaction. *Id.* at 1581 n. 7. In the instant case, the government did not raise the defense of accord and satisfaction until June of 1995, five years after NASSCO submitted its certified claim.

In *Community Heating and Plumbing*, the government continued to audit the contractor's claims years after they were submitted. *Id.* at 1581. In the instant case, the government audited at least part of NASSCO's claim not once, but twice following the execution of Modification A00139. The first audit, which consisted of an inspection of YUSA's request for equitable adjustment, was issued on February 28, 1991, a year and a half after NASSCO submitted its certified claim. The second audit, considering the entire certified claim for equitable adjustment, was issued on June 16, 1993, three years after NASSCO submitted its certified claim.

Third, the government in *Community Heating & Plumbing* reviewed the merits of the contractor's claims prior to and after the execution of the contract negotiations at issue in that case. *Id.* at 1581 n. 7. The government's letters to NASSCO on July 13, 1993 and February 17, 1995 evidence a review similar to that performed in *Community Heating & Plumbing*. Both letters requested extensions of time to issue a final decision due to the complexities of the certified claim for equitable adjustment. The government's letter to NASSCO on July 13, 1993 states that "efforts [were] being made for a reasonable resolution." These letters indicate that the government was engaged in a review of the merits of NASSCO's certified claim for equitable adjustment through 1995, five years after NASSCO submitted its certified claim. Along with the letters, the government sent NASSCO Information Request Forms related to NASSCO's certified claim beginning at least on June 1, 1994 and con-

tinuing through October 12, 1994. NASSCO answered these requests beginning on June 21, 1994 and continuing through November 1, 1994.

Finally, the evidence in *Community Heating and Plumbing* showed that the parties negotiated the contractor's claims after the execution of the modification. *Id.* at 1581 n. 7. Similarly, NASSCO and the government conducted negotiations after the execution of Modification A00139 which included NASSCO's certified claim for equitable adjustment. During the summer of 1995, NASSCO and the government were engaged in a series of negotiations over a number of different claims. A letter NASSCO sent to the government during the negotiations and entered into evidence included a chronology of the negotiations. The chronology stated that on June 13, 1995, the government met with NASSCO to resolve the certified claim for equitable adjustment. This was the meeting at which Mr. Thrasher, the procuring contracting officer, offered approximately $1,600,000.00 to settle the remaining claims, including NASSCO's certified claim for equitable adjustment. The government failed to successfully disprove that the offer described in the chronology was made, although at the trial, Mr. Thrasher attempted to rebut the information in the chronology as incorrect. He stated that his offer had been made only to resolve HMR–18, not to resolve NASSCO's certified claim. His testimony was not convincing. There were several occasions during Mr. Thrasher's testimony which caused the court to question his credibility. After listening to his tone of voice, observing his behavior and placing his words in the context of the whole case, the court felt that Mr. Thrasher was one of the witnesses in this case who was too vested in the government's position to offer objective recollections. When asked to explain why he offered to settle HMR–18 for $400,000.00 over NASSCO's requested amount and why the offer was conditioned on a release of NASSCO's certified claim for equitable adjustment, Mr. Thrasher only answered that he wanted a full and final settlement of all the issues.[9] One

9. It should be noted that the excess was not based on a cost/benefit analysis of the cost of

litigation. Mr. Thrasher stated that "there was

of the issues on the table was NASSCO's certified claim for equitable adjustment, which included the delay costs due to lack of government furnished property for the steering control subsystem. Thus, based on Mr. Thrasher's offer to settle HMR–18, which appears to have included money to cover NASSCO's certified claim for equitable adjustment, and the fact that the offer was conditioned upon a release of the certified claim, the court finds that the parties were negotiating the certified claim for equitable adjustment five years after they executed Modification A00139.

Finally, plaintiff has attempted to prove that the value NASSCO and the government placed on YUSA's termination costs settled in P00063 evidences a belief that the parties valued NASSCO's certified claim for equitable adjustment on delays arising from the lack of government furnished property and defective specifications at $1,300,000.00. Even plaintiff's counsel characterized the testimony on this point as "convoluted." The testimony is unclear as to how YUSA's termination costs, settled in Modification P00063, relate to the value the parties placed on NASSCO's certified claim for equitable adjustment. Therefore, the court does not consider this evidence probative in determining whether NASSCO and the government intended to settle the costs of impacts arising from delays due to the lack of government furnished property in Modification A00139.

Following June of 1995, when the government first asserted the defense of accord and satisfaction as to the impact of delays from the lack of government furnished property, defendant has tried to assert and to bolster its position that NASSCO's claims were discharged by Modification A00139. For example, Modification P00063, signed on June 14, 1996, contains the following reservation of rights, in which the government stated its position:

PRESERVATION OF RIGHTS; STEERING SYSTEM CLAIM—The settlement subject of this modification does not include NASSCO Case 440–378 [NASSCO'S request for equitable adjustment on the delays arising from the lack of govern-

ment furnished property and defective specifications on the AOE–6 contract]. The COFD [contracting officer's final decision] issued 08 August 1995 remains the Government's position for the claim's resolution. Nothing in this mutual settlement of claim matters shall prejudice the rights of either party hereto, including NASSCO's steering system subcontractor Jered Brown Brothers Inc., regarding any remedy which might be available in response to that COFD.

As evidenced in the preservation of rights, the government maintained that Modification A00139 discharged NASSCO's claim for equitable adjustment from June of 1995 through the signing of P00063, on June 14, 1996. Modification P00063 was a bilateral modification, executed by both the government and NASSCO. Therefore, NASSCO was aware of the government's position that the impact of delays from the lack of government furnished property were settled in Modification A00139. Modification P00063, however, also contains a preservation of rights by NASSCO. Similarly, NASSCO has remained firm in its position that the impact of delays from the lack of government furnished property was not settled in Modification A00139. According to the preservation of rights in Modification P00063, nothing in the Modification was to prejudice NASSCO's rights in this regard.

Since the execution of Modification A00139 in March of 1989, NASSCO has maintained a consistent position with regard to its assertion that the impact of delays arising from the lack of government furnished property was not settled in Modification A00139. The government, however, waited six years from the date Modification A00139 was signed, March 7 and 8 of 1988, and five years from the date NASSCO submitted its certified claim on July 23, 1990, to allege, in June of 1995, that the impact of delays arising from the lack of government furnished property was settled in Modification A00139. That the government has maintained this position since June of 1995 to the present is insufficient to counter the defendant's tardiness in asserting an accord and satisfaction.

no litigated risk assessment" in his offer to NASSCO.

The government has attempted to show that its audits and reviews following the execution of Modification A00139 were caused by NASSCO's inclusion in the certified claim for equitable adjustment of new claims that it had not previously raised and which the government was required to assess. NASSCO's July 23, 1990 certified claim filed with the contracting officer, in addition to a request for equitable adjustment based on lack of government furnished property, included claims based on defective specifications and stop work costs. Based on the evidence in the record, the defective specifications and stop work claims appear not to have been discussed before NASSCO submitted its certified claim.

The inclusion of the defective specifications and stop work claims in NASSCO's certified claim for equitable adjustment, however, do not explain why the government waited five years to raise the defense of accord and satisfaction as to the claim for delay costs arising out of the lack of government furnished property. It is unclear why the government would not have been quicker to assert the defense of an accord and satisfaction against the claim for delay arising from the lack of government furnished property regardless of whether a claim regarding defective specifications or stop work claim was included in the certified claim if, as the government argues, the government intended to include the delay costs for lack of government furnished property in Modification A00139. In addition, the government's audits of NASSCO's certified claim for equitable adjustment inspected all of the costs included in the certified claim, not only the costs claimed for the defective specifications or stop work costs. This court does not consider it logical for the government to have expended additional time and effort in auditing a claim it had already settled.

Moreover, the government has not proven that its review of the merits of NASSCO's certified claim was based on the inclusion of the defective specifications or stop work claims in the certified claim. The government's letters to NASSCO explaining the additional time required to issue a final decision on the certified claim do not explain that

the delay was due to the inclusion of the defective specification and stop work claims. The parties have stipulated that, "[b]eginning at least on June 1, 1994, and continuing through October 12, 1994, the Navy, seeking additional information on NASSCO's late GFP [government furnished property] claim, forwarded to NASSCO several Information Request Forms wherein the Navy asked NASSCO to provide additional information related to NASSCO's claim." These requests related to "NASSCO's late GFP claim," not the defective specifications or stop work claims.

Finally, the evidence showing that the parties negotiated NASSCO's certified claim for equitable adjustment does not pertain solely to the defective specifications or stop work portions of the claim. The addition of the defective specification and stop work claims does not explain why the government did not respond to NASSCO's letter including the chronology indicating that the government had offered to settle the certified claim or that Mr. Thrasher offered NASSCO $400,000.00 more than NASSCO's requested cost of HMR–18. Moreover, a part of Mr. Thrasher's offer to settle HMR–18, which occurred after Modification A00139 was executed, was a request for a release of the entire certified claim for equitable adjustment. Mr. Thrasher's offer appears from the evidence to have been, as he characterized it, a "thermonuclear," general release and was not limited to the defective specifications or stop work claims.

## CONCLUSION

Given the facts of the case before the court as developed during the oral testimony offered at the trial and the supporting exhibits entered into the record, NASSCO's claim for delay costs resulting from the lack of government furnished property due to the government's failure and alleged failure to make the government furnished property available on schedule is not barred by the defense of an accord and satisfaction. The government has failed to prove that there was a meeting of the minds with regard to the delay costs arising from the actual lack of government furnished property. The totality of the cir-

cumstances shows that the parties intended Contract Modification A00139 to include the costs of preparing the canceled ECPs, the cost of opening the ship to install the steering control system, and the costs of handling, reviewing, negotiating or attempting to resolve the lack of government furnished property and the costs which resulted from those attempts. Modification A00139 acted as an accord and satisfaction as to those costs. However, in accordance with the language of Modification A00139 and the proposals and discussions between the parties which led up to the Modification, the government has been unable to establish that the parties intended to include the cost of delays resulting from the actual lack of government furnished property in Modification A00139. The government's actions following the execution of Modification A00139, during which it audited, reviewed and negotiated the settlement of the costs at issue, manifested an intent by the parties that they had not resolved the costs arising from the delay caused by the lack of government furnished property in Modification A00139 and were willing to continue to discuss such a resolution.

**IT IS SO ORDERED.**